The HUNTSVILLE TIMES
CO. INC., Plaintiff,

v.

The UNITED STATES, Defendant,

Tennessee Valley Printing Co.,
Inc., Intervenor-defendant.

No. 10–812 C.

United States Court of Federal Claims.

March 31, 2011.[1]

1. This opinion was issued under seal on March 17, 2011. Pursuant to ¶ 6 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. Brackets ( [ ] ) identify the redacted portions of the opinion.

Lars E. Anderson, with whom were James Y. Boland and Maria Alejandra del–Cerro, Vienna, VA, for plaintiff. Jerome S. Gabig, Huntsville, AL, of counsel.

Michelle R. Milberg, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Steven J. Gillingham, Assistant Director, Washington, DC, for defendant. Captain Edward Ahn, United States Army Legal Services Agency, Arlington, VA and Wesley G. Smith, United States Army Aviation and Missile Command Legal Office, Redstone Arsenal, AL, of counsel.

Stephen D. Davis, II, with whom were J. Andrew Watson, III and Walter A. Dodgen, Huntsville, AL, for intervenor-defendant.

## OPINION AND ORDER

BUSH, Judge.

The Huntsville Times Co. Inc. (Huntsville) filed its post-award bid protest complaint on November 24, 2010. In its complaint, Huntsville challenges the award of a contract by the United States Army (Army) to Tennessee Valley Printing Co., Inc. (TVP), pursuant to Letter Request for Proposal (LRFP) No. W9124P–10–R–A005. The contract is for publication of the "Redstone Rocket," a free weekly publication distributed at the Redstone Arsenal in Alabama, and is a one-year contract, with four option years.[2] Huntsville seeks permanent injunctive and declaratory relief invalidating the award to TVP.[3] TVP has intervened in this suit. Plaintiff's bid protest is now before the court on cross motions for judgment on the administrative

---

2. These contractually-produced newspapers at military facilities are known as Civilian Enterprise (CE) newspapers, and are produced at no cost to the government. Publishers of CE newspapers depend on advertising revenues to finance their endeavors.

3. Plaintiff's requests for a temporary restraining order and a preliminary injunction were denied on November 29, 2010. *See* Order of December 3, 2010.

record brought pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC).

The administrative record (AR) of this procurement was filed on December 8, 2010, and plaintiff amended the complaint on December 15, 2010. Briefing was filed according to an expedited schedule. Oral argument was held on January 19, 2011, and supplemental briefs and replies thereto were filed on February 4 and 17, 2011. As discussed below, the Army's award decision was fundamentally flawed and must be enjoined. For this reason, plaintiff's motion for judgment on the administrative record is granted, and defendant's and intervenor-defendant's motions for judgment on the administrative record are denied.

## BACKGROUND

As the Army solicited proposals for the contract at issue in this suit, Huntsville had been the incumbent contractor producing the Redstone Rocket for approximately ten years. The LRFP was issued on July 15, 2010, and two proposals were received on August 12, 2010. TVP was awarded the contract on November 5, 2010. AR Tab 13 at 1. Plaintiff's challenge to the award to TVP focuses largely on the Army's evaluation of proposals, and to a lesser extent, on the allegedly disparate treatment of the two offerors. The court turns first to the evaluation criteria set forth in the LRFP.

There were four evaluation criteria listed in the LRFP:

*Technical and Production Capability*—compatibility of automation equipment proposed, printing capability, including production equipment availability and physical plant capabilities and offeror[']s proximity.

*Services and Items Offered*—adequacy, quality and amount of automation equipment, newsstands and cameras proposed, general services offered to produce a credible newspaper, usefulness and impact of special services offered to enhance newspaper production and hours of operation....

. . . .

*Past Performance Assessment*—successful production of a CE or similar publication including capability to sell advertising and recoup publication costs, printing ability, and timely and responsive contract performance[.]

*Management Approach*—involve interfacing with the [Public Affairs Office (PAO)] staff, controlling quality and timeliness of the CE newspaper, sale of ads that result in enhancing the publication's image, and ensuring that the contractor's personnel are properly supervised and managed.

AR Tab 5 at 2–3. Because CE newspapers are produced at no cost to the government, price was not a factor in this contract award. Thus, each proposal would be rated for four criteria which can be referred to, in abbreviated form, as Technical Capability, Services Offered, Past Performance and Management Approach. The Services Offered criteria contained a separate list of six enhancements or "desirable additions," which put the offerors on notice of the Army's suggestions for enhancements for the upcoming contract:

1. Hire an additional employee (either part-time or full-time) dedicated exclusively to the distribution of the Rocket so it can expand its circulation area. This employee would be in charge of weekly distribution at all newsstands and locations both on and off post, expanding the number of distribution locations and newsstands, handling issues arising from distribution, coordinating with various Rocket customers to ensure distribution to all employees, distributing Rockets to various Huntsville-area conventions and conferences related to the military, and working with the Garrison PAO to address various distribution issues. High Importance.

2. Provide higher quality photography equipment with flash capability that would deliver better quality photographs in places like the Officers and Civilians Club, and Bob Jones Auditorium. Equipment should be updated every year. High Importance.

3. Review annually—or as needed—the computer needs of the Rocket office and provide computer equipment as needed, with inclusion of a scanner and Internet air cards, to augment equipment currently in use. High Importance.

4. Provide ongoing training opportunities for Rocket employees to improve Rocket content. Medium Importance.

5. Develop and implement a marketing campaign to introduce the Rocket to new readers as new Army organizations mo[v]e onto Redstone Arsenal. This campaign could include billboards at the gates, free Rocket give-away items at on-post employee events and employee equipment (pens, notepads, camera bags) carrying the Rocket logo. Medium Importance.

6. Update the Rocket web site and provide online access through publisher links to the PAO website. Medium Importance.

*Id.*

The LRFP disclosed the weighting of the evaluation factors:

The weighting of the areas is as follows: Technical and Production Capability and Services and Items Offered are approximately equal in importance. Technical and Production Capability and Services and Items Offered are each approximately twice as important as Past Performance. The Management Approach has the least weighting.

*Id.* at 3.

There are two other portions of the LRFP which are important to the court's analysis. The first is the list of information required to be included in each proposal, which the court reproduces here in its entirety:

Each offeror's proposal shall include the following information: (a) a description of the publisher's facilities and location of the printer, if different from the publisher, (b) information regarding the publisher's financial ability to publish a CE newspaper, (c) description and location of the organization that will sell advertising, (d) a description of the experience of the publisher in publishing CE newspapers for a military audience and/or similar commercial endeavors with revenue based totally on the sale of advertising, (e) a specimen sheet of typefaces available for use, (f) a representative sample of the proposed production quality of the Redstone Rocket, (g) the proposed size and number of pages, column widths, and editorial copy deadlines,

(h) proposed frequency publisher will offer color printing, both one-color and four-color, (i) a statement that the publisher will perform in accordance with Attachment 01 and agrees to abide by all Department of Defense (DOD), Army, and Garrison newspaper regulations and policies; including those dealing with the use of political material, truth in advertising and lending, and ensuring that products or services advertised are available on a non-discriminatory basis, (j) any other information which the potential publisher wishes to present for evaluation, such as equipment, personnel, or other services the potential publisher will provide to enhance the publication of the Redstone Rocket.

AR Tab 5 at 1–2. The second is a contract requirement, set forth in the Statement of Work in the LRFP, describing the paper stock to be used for the Redstone Rocket:

Paper Stock. The Contractor shall provide sufficient paper stock for selection by the Government prior to the time of initial printing. As a minimum, paper stock will be standard newsprint stock and recyclable paper. The use of recycled paper, where economically feasible, for internal products will be a consideration for contract award.

*Id.* at 11. The court reserves further examination of the LRFP for the discussion section of this opinion.

As is typical in many government procurements, an evaluation team was designated, which in this case was referred to as either the Evaluation Committee (EC), or the Source Selection Evaluation Board (SSEB). AR Tab 4 at 3, 15; *id.* Tab 10 at 2. The recommendations of the EC were reviewed by the Source Selection Authority (SSA), who issued the award decision in the form of a Source Selection Decision Document (SSDD). AR Tab 10 at 1. The EC's consensus ratings can be summarized in this manner:

TVP: Technical Capability—**Good**; Services Offered—**Superior**; Past Performance—**Superior**; Management Approach—**Good**.

Huntsville: Technical Capability—**Good**; Services Offered—**Good**; Past Perform-

ance—**Good**; Management Approach—**Adequate**.

AR Tab 8 at 1, 3, 5, 7; *id.* Tab 9 at 1, 3, 5, 7; *id.* Tab 10 at 2.

The SSA reported that TVP's overall consensus rating from the EC was Superior, and that Huntsville's overall consensus rating from the EC was Good. AR Tab 10 at 2. The court notes that the EC's overall "consensus" rating of the two proposals is not documented anywhere in the administrative record, other than the announcement of the EC's overall "consensus" ratings in the SSDD. The SSA stated that he considered the ratings compiled by the EC, and had discussions with the EC's chair, before he reached an "independent judgment" that TVP provided the most advantageous proposal, based on his "individual assessment and comparison of the strengths and weaknesses of the proposals received." *Id.* at 1–3.

## DISCUSSION

### I. Bid Protest Jurisdiction

■ This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed.Cir.2002) (citation omitted).

### II. Standard of Review for Judgment on the Administrative Record

RCFC 52.1(c) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356–57 (Fed.Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

### III. Bid Protest Review

■ The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC*, 316 F.3d at 1319. Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE*)). Bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE*, 258 F.3d at 1302). A protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement, and has standing before this court. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307–08 (Fed.Cir.2006) (citations omitted).

■ As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [ (2006) ]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085–86 (Fed.Cir.2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*,

238 F.3d 1324, 1332–33 (Fed.Cir.2001)). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States,* 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988)).

In addition, the court may not substitute its judgment for the agency's expertise in procuring services to meet the needs of the government. *See, e.g., Ala. Aircraft Indus., Inc.-Birmingham v. United States,* 586 F.3d 1372, 1376 (Fed.Cir.2009) (reversing this court when it "substitut[ed] ... the court's judgment for the agency's with regard to how the contract work should be designed" (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))). Instead, the court must "determine whether the agency's ... analysis [of proposals] was consistent with the evaluation criteria set forth in the [solicitation]." *Id.* at 1375–76 (citation omitted). The court will "sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts,* 216 F.3d at 1058 (citation omitted).

" 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] ... it proceeds to determine,

as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement errors of the agency, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts,* 216 F.3d at 1057).

## IV. Standing

Only a protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement and standing before this court. *Rex Service,* 448 F.3d at 1307–08. Neither defendant nor intervenor-defendant challenges Huntsville's standing to bring this protest. Here, Huntsville was the incumbent contractor, and one of only two offerors to respond to the LRFP. Huntsville's proposal was rated at least adequate in all of the evaluation criteria listed in the LRFP, and Huntsville's proposal had a substantial chance of being selected for award, if all of the procurement errors alleged by plaintiff were corrected. For this reason, Huntsville has standing to bring this bid protest.

## V. Regulatory Standard for CE Newspaper Contracting

This procurement is governed by 32 C.F.R. pt. 247 (2010), "Department of Defense Newspapers, Magazines and Civilian Enterprise Publications." [4] It is important to note that contracting for CE newspapers is not governed by the Federal Acquisition Regulation (FAR) or the Defense Federal Acquisition Regulation Supplement (DFARS).[5] *See* 32 C.F.R. pt. 247 App.

---

4. Because the administrative record and the parties' briefing of their cross-motions for summary judgment did not reference this regulation, the court ordered supplemental briefing regarding the standard provided by 32 C.F.R. pt. 247. *See* Order of January 20, 2011.

5. The contracting officer is instructed, however, to use "chapter I and II [of the FAR] as guides" when "combin[ing] the statement of work with appropriate contractual terms and conditions" to produce a solicitation and contract for CE publications. 32 C.F.R. pt. 247 App. B(J)(2).

B(J)(2) (stating that "CE contracts are not subject to the FAR or DFARS, because they do not involve the expenditure of appropriated funds"). For this reason, the arguments of the parties that reference specific FAR provisions, particularly those that set standards for communications between offerors and a procuring authority, are largely unhelpful.[6] In general, the government must "ensure that the [procurement] process is objective and fair." 32 C.F.R. pt. 247 App. B(J)(8)(c).

The LRFP in this procurement references not the applicable regulation, but Department of Defense Instruction (DODI) 5120.4 (dated June 16, 1997), a document which largely replicates the standards and information contained in 32 C.F.R. pt. 247. The governing regulation and DODI 5120.4 each include an attached sample source selection plan and a sample evaluation scoring sheet, which are similar if not identical in content. *Compare* 32 C.F.R. pt. 247 App. B Atts. 1–2 with DODI 5120.4 Enc. 4 Atts. 1–2. The parties disagree as to whether the numerical scoring system set forth in the sample source selection plan and scoring sheet is required by the regulation, or is simply provided as an example. The court agrees with defendant and TVP that the numerical scoring system offered as an example by the regulation provides guidance to the Army, but does not impose this, or any other, numerical scoring system as a requirement for this procurement.

The sample source selection plan, however, does contain certain expressions of basic procurement fairness which cannot be categorized as merely advisory. Indeed, these basic principles were incorporated into the Source Selection Plan (SSP) adopted by the Army for the Redstone Rocket procurement. The sample source selection plan in the regu-

lation included these objectives, among others:

b. Establish a well-balanced evaluation structure, equitable and uniform scoring procedures, and a thorough and accurate appraisal of all considerations pertinent to the negotiated contracting process.

c. Provide the selecting official with meaningful findings that are clearly presented and founded on the collective, independent judgment of technical and managerial experts.

d. Ensure identification and selection of a contractor whose final proposal offers optimum satisfaction of the Government's technical and managerial requirements as expressed in the RFP [Request for Proposal].

32 C.F.R. pt. 247 App. B Att. 1(A)(2)(b)–(d). The SSP developed for this procurement contains similar, almost identical, language, declaring that the plan will:

b. Establish a well-balanced evaluation structure, equitable and uniform rating procedures, and a thorough and accurate appraisal of all considerations pertinent to the negotiated contracting process.

c. Provide the selecting official with meaningful findings that are clearly presented and founded on the collective, independent judgment of the EC.

d. Ensure identification and selection of a contractor whose final proposal offers optimum satisfaction of the Government's requirements as expressed in the Request for Proposal (RFP).

AR Tab 4 at 3.[7] Because these clear requirements for procurement fairness are presented in the regulation, albeit in a sample source selection plan, the court views these most basic and essential elements of a source

---

6. To the extent that basic procurement fairness principles are elucidated in the FAR, and in caselaw interpreting the FAR, the court has consulted such authorities for their guidance. Arguments based solely on the strictures of an inapplicable regulation or rule, however, will not be discussed in this opinion. *See* Pl.'s Reply at 8 (comparing FAR provisions that distinguish between clarifications and discussions); Def.'s Supp. Br. at 9 n. 5 (relying on "not strictly

applicable" Army Federal Acquisition Regulation Supplement (AFARS) 5115.304(b)(2)(D), as support for the evaluation procedures utilized in this procurement).

7. The AR filed under seal with the court in CD–ROM format is missing Tab 4. Defendant shall correct this omission to create a full record of this litigation.

selection plan as mandatory and binding upon the Army in this procurement.[8]

■ The court notes that the elements of a source selection plan are not considered to provide *procedural* requirements that are binding on a procuring agency. *See, e.g., ManTech Telecomms. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 67 (2001) (noting that the source selection plan in that case "ha[d] little, if any, bearing in defining the rights of the parties under the Solicitation" at issue in that bid protest). Nonetheless, this court typically reviews the source selection plan, evaluation worksheets, consensus ratings and the source selection decision document for evidence of rational decision-making and adherence to the evaluation criteria expressed in a solicitation. *See, e.g., USfalcon, Inc. v. United States,* 92 Fed.Cl. 436, 455 (2010) (noting that "when a source selection plan is the source of the ratings definitions that are followed in the course of evaluating offerors, it figures prominently in court review of a procurement decision."). In this case, the SSP was contradictory, confusing, and permitted the agency to stray from adhering to the evaluation criteria described in the LRFP.

## VI. The Source Selection Plan Contained Two Conflicting Sets of Evaluation Criteria, Conflicting Weighting Schemes, and Was Not Approved in Accordance with the Governing Regulation

■ According to the introduction to the SSP, this document "describe[d] the organization, responsibilities, evaluation process, and instructions to the evaluation committee for the competitive award of a civilian printer for the civilian enterprise (CE) installation newspaper, hereinafter referred to as the Redstone Rocket." AR Tab 4 at 3. The purpose of the SSP was to "to ensure an impartial; equitable, and thorough evaluation of proposals; ensure that the technical evaluation findings provide for the selection of the offer most advantageous to the Government; and document all aspects of the evaluation

and decision process." *Id.* According to the governing regulation, the EC must follow the SSP, because the SSP "serve[s] as a guide for the personnel involved and ensure[s] a fair and objective process and a successful outcome." 32 C.F.R. pt. 247 App. B(J)(8)(b)–(9).

### A. Evaluation Criteria Set A and Evaluation Criteria Set B

As plaintiff points out, the SSP contained two conflicting expressions of the evaluation criteria against which proposals would be rated. Pl.'s Mot. at 13 n. 8. Neither defendant nor intervenor-defendant has rebutted this allegation of fact, which is fully supported by the administrative record. *Compare* AR Tab 4 at 8–11 with id. at 11–13. The court will refer to these two sections of the SSP as Evaluation Criteria Set A, *id.* at 8–11, and Evaluation Criteria Set B, *id.* at 11–13, or simply as Set A and Set B.

Both Set A and Set B set forth the same four evaluation criteria headings, Technical Capability, Services Offered, Past Performance and Management Approach, but each set describes these evaluation criteria differently. Indeed, of the four evaluation criteria, only the sub-factors of Technical Capability could be said to have been described in roughly the same terms in both Set A and Set B. Here is the description of Technical Capability criteria, version Set A:

   a.  Compatibility of automation equipment proposed.

   b.  Printing capability, including production equipment availability and physical plant capabilities.

   c.  Offeror[']s proximity.

AR Tab 4 at 8. Here is the description of Technical Capability criteria, version Set B:

   1.  General Services—Does the offeror provide evidence of their ability to produce a timely product that looks credible?

   2.  Level of automation. Does the offeror propose compatible equipment and/or services to enable a systematic flow of information to and from the PAO?

which will be discussed *infra.* There are also significant differences between the SSP and the sample plan attached to the regulation.

---

8. There are further similarities between the SSP developed in this procurement and the sample source selection plan presented in the regulation,

3. Offeror[']s Proximity. Are the offeror's facilities so far away to make time and distance a critical element? Does the offeror propose remedies for these concerns? AR Tab 4 at 11. Even if the sub-factors for Technical Capability are not *markedly* different in Set A and Set B, the court notes that, to cite just one example of significant differences, proximity is measured in objective terms (near or far) in Set A (and in the LRFP), but in Set B, proximity has a much more nuanced meaning ("so far away" as to be "a critical element," and allowing for the proposal of "remedies" to improve the "proximity" of a distant offeror).

Before going any further, it is important to note that Set A closely tracks the evaluation criteria descriptions set forth in the LRFP, and Set B diverges noticeably from the descriptions of these criteria in the LRFP. It is also important to note that many of the significant ratings noted by the EC in this procurement are specific strengths and weaknesses that are criteria descriptions found only in Set B. This presents two problems. First, if the EC rated proposals based on Set B, and significant differences exist between the evaluation criteria in the LRFP and Evaluation Criteria Set B of the SSP, such an evaluation would not meet the standard set forth in 32 C.F.R. pt. 247. In other words, proposals would not have been rated according to the evaluation criteria presented to the offerors. Second, if Set A and Set B contained fundamentally conflicting evaluation criteria and provided confusing and contradictory guidance to the EC, the evaluation performed by the EC could not be deemed to have been conducted in a rational manner. The court now continues its examination of Evaluation Criteria Set A and Evaluation Criteria Set B.

Here is the description of Services Offered in Set A:

a. Adequacy, quality and amount of automation equipment, newsstands, and cameras proposed.

b. General services (editorial and photographic services, type styles, spot and process color, number of pages per issue, and paper stock) offered to produce a credible newspaper.

c. Usefulness and impact of special services offered to enhance newspaper production.

d. Hours of operations.

AR Tab 4 at 8. Here are the Services Offered criteria in Set B:

1. The usefulness of the services and/or items offered to enhance the newspaper.

2. Offeror[']s hours of operation. Normal business hours the printer will be available to the Redstone Rocket staff and the medium(s) proposed for communicating.

*Id.* at 12. The difference between these two lists is striking, and only Set A resembles the criteria for Services Offered described in the LRFP.

Moving on to the "desirable additions" or enhancements to Services Offered described in Set A:

1. Hire an additional employee (either part-time or full-time) dedicated exclusively to the distribution of the Rocket so it can expand its circulation area. This employee would be in charge of weekly distribution at all newsstands and locations both on and off post, expanding the number of distribution locations and newsstands, handling issues arising from distribution, coordinating with various Rocket customers to ensure distribution to all employees, distributing Rockets to various Huntsville-area conventions and conferences related to the military, and working with the Garrison PAO to address various distribution issues. High Importance.

2. Provide higher quality photography equipment with flash capability that would deliver better quality photographs in places like the Officers and Civilians Club, and Bob Jones Auditorium. Equipment should be updated every year. High Importance.

3. Review annually—or as needed—the computer needs of the Rocket office and provide computer equipment as needed, with inclusion of a scanner and Internet air cards, to augment equipment currently in use. High Importance.

4. Provide ongoing training opportunities for Rocket employees to improve Rocket content. Medium Importance.

5. Develop and implement a marketing campaign to introduce the Rocket to new readers as new Army organizations mo[v]e onto Redstone Arsenal. This campaign could include billboards at the gates, free Rocket give-away items at on-post employee events and employee equipment (pens, notepads, camera bags) carrying the Rocket logo. Medium Importance.

6. Update the Rocket web site and provide online access through publisher links to the PAO website. Medium Importance.

*Id.* at 9. A different set of enhancements was listed for Services Offered in Set B:

a. Additional software/hardware/peripherals designed to maximize Redstone Rocket staff efficiency and overall newspaper effectiveness.

b. Additional number of experienced reporters/writers.

c. Digital cameras for all contractor personnel and editor.

d. Enclosed or otherwise weather resistant designed newsstands.

*Id.* at 12. Once again, the enhancements for Services Offered in Evaluation Criteria Set A closely track the enhancements for Services Offered in the LRFP, whereas Set B emphasizes different aspects of a proposal, and does not distinguish between high and medium importance enhancements.

Turning now to the less-heavily weighted criteria, Past Performance in Set A includes these sub-factors:

(1) Successful production of a CE or similar publication including capability to sell advertising and recoup publication costs.

(2) Printing ability.

(3) Timely and responsive contract performance.

*Id.* at 10. In Set B, however, a different description of Past Performance criteria is presented:

1. Demonstrated ability to successfully produce a CE or similar publication including the ability to generate adequate revenue by selling advertising. Does the offeror provide evidence he operates on a financially sound basis?

2. Demonstrated printing ability. Is the offeror an established firm or a first-time bidder? Does the offeror provide evidence that their customer(s) is satisfied with their performance?

*Id.* at 12. Set A is a faithful reproduction of the Past Performance criteria listed in the LRFP, whereas Set B introduces different terminology and concepts altogether.

Finally, the least-weighted factor of Management Approach is described as requiring "a sound and innovative approach to interfacing with the PAO and managing the CE publication operation" in Set A, and includes these sub-factors:

a. Interfacing with the PAO staff.

b. Controlling the quality and timeliness of the finished product.

c. Sale of ads of the type that enhance the publication's image in the community and with the readership at large.

d. Ensuring that the contractor's personnel are properly supervised and managed.

*Id.* at 10–11. In Set B, Management Approach, although still requiring a "sound and innovative approach to interfacing with the PAO and managing the CE publication," has different evaluation criteria:

a. Does the offeror have regularly scheduled meetings with PAO to review ongoing performance and possible improvements in publication?

b. Does the offeror assist in editing and ensuring a quality product every week? Does the offeror publish the Redstone Rocket on schedule and is it delivered on schedule?

c. Does the offeror ensure that advertising is appropriate per Army standards? Do ads support the goal to communicate the Army message and do they enhance the image of the Army within the community?

d. Does the offeror address issues pertaining to the supervision and management of contract employees? Does the offeror ensure the quality of contract employees?

*Id.* at 13. Once again, Set A tracks the description of Management Approach found in the LRFP, and Set B sets forth a somewhat different description of a "sound and innovative approach." *Id.*

In the end, this analysis of the differences between Evaluation Criteria Set A and Evaluation Criteria Set B is disturbing. The evaluation team, the EC, was given two very different sets of evaluation criteria, and it is difficult to imagine how such an evaluation process could reconcile the conflicting descriptions of the evaluation criteria and apply these evaluation criteria with any degree of uniformity or accuracy. Indeed, proceeding with an internally inconsistent source selection plan appears to the court to be an irrational enterprise, not a rational one. It is also disturbing to note that the EC relied heavily on the descriptions of sub-factors of criteria found in Set B, when Set B differed so significantly from the descriptions of evaluation criteria sub-factors advertised in the LRFP. *See CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 728 (1987) (noting that if the government "utilized the evaluation criteria listed in the SSP rather than the RFP, and if the SSP evaluation factors were significantly different from the RFP evaluation factors (in terms of content and/or relative importance), then [the protestor] would be entitled to relief assuming that it was prejudiced by such actions."), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). The court now turns to another flaw in the rating procedures set forth in the SSP.

### B. Differing Weighting Schemes

As stated in the background section of this opinion, the weighting scheme in the LRFP informed offerors that Technical Capability and Services Offered were approximately equal in weight, Past Performance had approximately half the weight of Technical Capability or Services Offered, and Management Approach had less weight than Past Performance. AR Tab 5 at 3. The SSP has three weighting pronouncements, all of them

distinguishable from the weighting scheme announced in the LRFP. First, in what appears to be the weighting scheme to be applied to Evaluation Criteria Set A,[9] the SSP states that:

> Technical and Production Capability and Services and Items Offered are approximately equal in importance.

> Technical and Production Capability and Services and Items Offered are each approximately twice as important as Past Performance. Past Performance is approximately twice as important as Management Approach.

AR Tab 4 at 7. Aside from a slight difference in describing the weight of the Management Approach rating, this pronouncement is roughly consistent with the LRFP.

Next, however, within the text of the Services Offered evaluation criteria, Set A announces that the sub-factors announced in Services Offered (version Set A) are "listed in order of relative importance." *Id.* at 8. The same sub-factors in the LRFP are not similarly designated, AR Tab 5 at 2, and many offerors with experience in FAR-governed procurements would assume that the listed Services Offered sub-factors were *equal* in importance, *see, e.g., Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. 303, 321 (2000) ("In the absence of a statement of the relative importance of the factors or subfactors, [the FAR instructs that] each factor or subfactor must be weighed equally." (citing *Isratex, Inc. v. United States,* 25 Cl.Ct. 223, 229 (1992))). Finally, Set B contains an assignment of weight to the four evaluation factors, so that the percent weighting is as follows: Technical Capability (40%); Services Offered (30%); Past Performance (20%), and Management Approach (10%). AR Tab 4 at 11–13. The court notes that most mathematicians would dispute that 40% is approximately equal to 30%, and finds that Set B's weighting scheme varies significantly from the weighting scheme set forth in the LRFP.[10]

---

**9.** This statement of weighting is included in the same SSP section as Set A.

**10.** The court notes that the weighting scheme in Evaluation Criteria Set B matches the scheme set

forth in the sample source selection plan in 32 C.F.R. pt. 247 App. B Att. 1(E)(3), but does not match the narrative description of the weighting scheme set forth in the LRFP.

Having thus discovered that the SSP contains weighting schemes that differ from the scheme presented in the LRFP, the court cannot immediately determine the gravity of this error. The court found no evidence of mathematical scoring in the administrative record, and defendant's counsel agreed that there is no evidence before the court that "numerical scoring" was utilized by the Army in this procurement. Oral Arg. Tr. at 53. Nor has the court found any evidence that the EC or the SSA adhered to, or even applied, the weighting scheme presented to offerors in the LRFP. To the extent that the two competing proposals for this CE newspaper contract each had a substantial chance of award, as discussed below, the court finds the absence of any evidence of the application of the weighting scheme set forth in the LRFP troubling.

The court also has considered whether the absence of numerical scoring was a flaw in this procurement. To be sure, the governing regulation does not require mathematical scoring of proposals, yet it is not insignificant that the regulation attaches a sample source selection plan that uses such a system. *See* 32 C.F.R. pt. 247 App. B Atts. 1–2. Even in the absence of a requirement for numerical scoring of proposals, the regulation nonetheless requires that "equitable and uniform scoring procedures" be utilized. *Id.* Att. 1(A)(2)(b). Further, the regulation requires that proposal evaluations be performed "in accordance with the evaluation criteria presented in the request for proposals (RFP)." *Id.* Att. 1(A)(1)(a). In this procurement, the LRFP presented a specific weighting system. AR Tab 5 at 3. No weighting of the EC's ratings, or of the SSA's ratings, is noted in the administrative record, however.

The court observes that this LRFP's weighting scheme would be difficult to apply equitably in most instances, without some resort to mathematical scoring. Be that as it may, in this case the government appears to have been confronted with various weighting schemes and apparently chose to apply none. The court cannot condone non-weighted evaluation procedures that conflict with the LRFP. When the EC and the SSA failed to apply the weighting system set forth in the LRFP, the government did not faithfully follow the evaluation scheme presented to offerors, and failed to meet the standards imposed by 32 C.F.R. pt. 247.[11]

### C. The Source Selection Plan Was Not Approved Until After the Source Selection Decision Document Was Issued

According to the standard governing this procurement,

> A SSP ... must be developed early in the planning process to serve as a guide for the personnel involved and ensure a fair and objective process and a successful outcome. The contracting officer is primarily responsible for development of the SSP, in coordination with the PAO and other members of the [EC]. Ideally, the SSP should be completed and approved prior to issuance of the solicitation; *it must be completed and approved* before the receipt of proposals.

32 C.F.R. pt. 247 App. B(J)(9) (emphasis added). Here, proposals were received on August 12, 2010. AR Tabs 6–7. The EC evaluation worksheets are dated September 29, 2010. AR Tabs 8–9. The Source Selection Decision Document was signed on October 13, 2010. AR Tab 10 at 3. The Source Selection Plan approval is dated the next day, October 14, 2010. AR Tab 4 at 2. This record shows that the SSP used by the EC was not approved until after the EC's work was complete, was not approved until after the SSA had made his award decision, and was not approved until well after proposals

---

11. The Source Selection Decision Document quotes one version of the weighting system set forth in the SSP, *compare* AR Tab 10 at 1 *with id.* Tab 4 at 7, but does not explain how the weighting system was applied by the EC, if it indeed was applied, or how the weighting system was applied by the SSA, if it indeed was applied. Perhaps the SSA believed that the adjectival ratings of the EC spoke for themselves and required no explicit weighting to indicate the most advantageous proposal. This approach would not be justified in these circumstances, where the EC was guided by an internally inconsistent SSP that did not accurately reflect the criteria in the LRFP, and where the EC produced ratings which were themselves fundamentally flawed and irrational.

had been received on August 12, 2010. The SSP was therefore not approved in accordance with either the spirit or the letter of the governing regulatory standard.

The court notes that the failure to approve an SSP in a timely fashion, in some cases, might, perhaps, constitute only harmless error, if proper and reasonable evaluation procedures were clearly outlined in the SSP in question and were followed by the evaluation team. Here, however, the SSP failed to conform to the evaluation criteria in the LRFP. This SSP contained conflicting versions of evaluation criteria, and conflicting weighting schemes. In light of the improper, confusing and irrational nature of the SSP adopted here by the Army, failure to obtain the timely approval required by 32 C.F.R. pt. 247 is a serious violation of the regulation governing this type of procurement.

Having noted significant flaws in the SSP and the evaluation procedures used here by the Army, the court now turns to a more specific examination of the evaluation errors generated by the EC and the SSA.

## VII. Evaluation Errors Committed by the Evaluation Committee

In addition to the creation of a flawed SSP, the failure to get the SSP approved before offers were received on August 12, 2010, and the failure to document any weighting of the evaluation criteria ratings, this court has found significant errors in every area of the consensus evaluation produced by the EC. The court turns first to Technical Capability, one of the two most important evaluation criteria.

### A. Technical Capability

The Technical Capability sub-factors were identified in the LRFP as "compatibility of automation equipment proposed, printing capability, including production equipment availability and physical plant capabilities and offeror[']s proximity." AR Tab 5 at 2. These terms are explained in the sample source selection plan provided in the CE newspapers contracting regulation:

> Factors to be considered for newspaper contracts include: level of automation; compatibility of automation with existing

PAO automation (unless other automation is provided); printing capability; production equipment; physical plant (capabilities); and driving distance to the plant.

32 C.F.R. pt. 247 App. B. Att. 1(E)(2)(a).

The regulation, and, indeed, the common sense meaning of the terms used to describe the Technical Capability sub-factors in the LRFP should have pointed the evaluators to an offeror's automation equipment compatibility, printing plant capabilities, and production equipment availability, as well as the proximity of the contractor's production and printing facilities. Instead, the EC awarded two strengths to TVP for Technical Capability for proposal elements that clearly cannot be considered strengths under this factor. The most egregious example is a strength awarded to TVP in the sub-factor of proximity, because TVP "[p]roposed an office 1–2 miles from [the Redstone Arsenal] due to current location." AR Tab 8 at 2. TVP's printing plant is located sixty-seven miles from the Redstone Arsenal, and TVP did not propose to move this plant, whereas Huntsville's combined publication and printing facility is located three miles from the Arsenal. AR Tab 8 at 2, Tab 9 at 1–2. A second erroneous strength was awarded to TVP for a lay-out employee who would work on the Redstone Rocket, whereas staffing is clearly part of the Services Offered sub-factor, not Technical Capability. AR Tab 8 at 2.

Furthermore, the EC strayed from the LRFP in other ways. The EC appears to have relied on Evaluation Criteria Set B in the SSP to focus on a sub-factor not listed in the LRFP, while, at the same time, the EC failed to produce a consensus rating for TVP's automation equipment compatibility. Specifically, the EC found "evidence of [an offeror's] ability to produce a timely product that looks credible," AR Tab 4 at 10, a Set B Technical Capability sub-factor description, when it concluded that TVP "provides ample evidence of their ability to provide a timely and credible product," *id.* Tab 8 at 1. No mention of TVP's automation equipment compatibility, however, is made in the EC's consensus rating of TVP's Technical Capability. AR Tab 8 at 1–2. These errors show

that the EC did not adhere to the evaluation criteria set forth in the LRFP.[12]

### B. Services Offered
#### 1. Basic Sub–Factors for Services Offered

Services Offered was the other heavily-weighted evaluation factor, and included several basic sub-factors, as well as six specific enhancements, as discussed *supra*. The LRFP described the basic sub-factors as including "adequacy, quality and amount of automation equipment, newsstands and cameras proposed, general services offered to produce a credible newspaper, usefulness and impact of special services offered to enhance newspaper production and hours of operation." AR Tab 5 at 2. The EC's rating of TVP's basic sub-factors of Services Offered is erroneous in one significant respect, where TVP was awarded a strength for offering non-recycled paper, in clear contravention of the preference for recycled paper stated in both the LRFP and 32 C.F.R. pt. 247.[13] *See* Tab 5 at 11; see also 32 C.F.R. pt. 247 App. B(J)(3)(h). In other respects, TVP's rating for the basic sub-factors of Services Offered was generally sound.[14]

As to Huntsville's rating on the basic evaluation sub-factors of Services Offered, one point of dispute between the parties is whether the EC should have rated Huntsville negatively for not having provided a specific promise that its newsstands would be weather-proof. *See* Pl.'s Reply at 10. The court agrees with defendant and intervenor-defendant that the EC could consider a promise of weather-proof newsstands to be indicative of the adequacy or quality of newsstands, a Services Offered evaluation sub-factor listed in the LRFP. Thus, the absence of a promise to provide weather-proof newsstands could be considered to be a proposal weakness under Services Offered.

Plaintiff argues, and the court agrees, that the EC had access to certain relevant information regarding Huntsville's performance as the incumbent contractor, and that use of such information is permissible in evaluating proposals for a CE publication contract. *See* 32 C.F.R. pt. 247 App. B(J)(8)(b). Plaintiff therefore contends that the EC should have known that Huntsville had already provided weather-proof newsstands, and should not have penalized Huntsville's proposal for its non-specific offer of newsstands. Pl.'s Mot. at 14–15. In the court's view, however, the EC was only required to not ignore the "big-picture" realities of Huntsville's incumbency, such as timeliness of publication, awards for excellence, experience, financial stability, and other accomplishments, when these qualities were mentioned or alluded to in Huntsville's proposal. The EC was not required to ascertain specific, non-obvious strengths in Huntsville's performance that were not mentioned or alluded to in its proposal. For this reason, the court does not believe the EC erred when distinguishing between TVP's offer of weather-proof newsstands and Huntsville's offer of newsstands.

The court cannot agree, however, that the Army was justified in noting a weakness in Huntsville's Services Offered for conflicting

---

**12.** As a further example of inaccurate ratings for Technical Capability, Huntsville's "proposed editorial deadlines" are mentioned as part of a strength in the EC's Technical Capability consensus rating for Huntsville's proposal, AR Tab 9 at 2, even though controlling the timeliness of publication is clearly a sub-factor in Management Approach, not Technical Capability, AR Tab 5 at 3.

**13.** The government and intervenor-defendant argue that TVP's offer of non-recycled paper was correctly rated by the EC. See Def.'s Reply at 9 (arguing that the "Army ... rationally credited [TVP] for proposing whiter newsprint with no recycled content"); TVP's Supp. Br. at 7–8. The LRFP, however, instructed offerors that the proposed use of recycled paper, where economically feasible, "will be a consideration for award." AR Tab 5 at 11. The regulation states the same preference for recycled paper. 32 C.F.R. pt. 247 App. B(J)(3)(h). TVP's offer cannot be read to suggest that recycled paper was too expensive to be economically feasible. In these circumstances, the EC's award of a strength to TVP for its offer of non-recycled paper was contrary to the LRFP and the governing regulation.

**14.** The court agrees with defendant and intervenor-defendant that an obvious omission of TVP's hours of operation could be corrected by written communication from the responsible contracting officer. The court finds that such a communication is permitted pursuant to 32 C.F.R. pt. 247 App. B(J)(8)(c). The record shows no violation of this regulatory provision.

distribution numbers. *See* AR Tab 9 at 4. The text of Huntsville's proposal clearly states that Huntsville will meet the distribution minimum specified in the LRFP, and would distribute at least 25,000 copies of the Redstone Rocket. AR Tab 6 at 6. Huntsville also attached, as additional evidence of its understanding of distribution requirements, a document labeled "Distribution Center Deliveries" composed of detailed spreadsheets which specified the type of delivery (white rack, wire rack, on table, at door), and indicated the number of copies delivered at each location. AR Tab 6 at 12–14. Although this list reports [ ] as the total number of copies delivered, the attachment does not indicate whether this number applies to the existing or proposed contract. In addition, a chart in the Statement of Work in Huntsville's proposal included [ ] as the number of copies in the distribution list.[15] *Id.* at 29. To the extent that the EC was confused by these figures in the attachments to the narrative of Huntsville's proposal, and questioned whether Huntsville did indeed promise to distribute at least 25,000 copies of the Redstone Rocket, the only equitable treatment of the two offerors would have been to seek a clarification from Huntsville in this regard. It was patently unfair to seek clarification of TVP's hours of operation, entirely omitted from its proposal, and not seek confirmation from Huntsville that it understood the distribution requirement and unequivocally promised to distribute at least 25,000 copies of the newspaper, when an unequivocal promise to meet that minimum requirement was clearly stated in the narrative of Huntsville's proposal.[16]

The court therefore concludes that the EC's rating of the basic sub-factors of Services Offered for the two offerors was significantly flawed. TVP was awarded an inappropriate strength for the use of non-recycled paper, and Huntsville was awarded an inappropriate weakness for including distribution figures in certain attachments which did not match the narrative of its proposal. The court now turns to the ratings received by TVP and Huntsville for enhancements to Services Offered.

## 2. Enhancements to Services Offered

The enhancements to Services Offered listed in the LRFP were six in number, and contained what appear to be requests for improvement of the services provided by the incumbent contractor. Three of these enhancements were listed as being of high importance, and three were of medium importance. The EC stated, somewhat confusingly, that Huntsville "met all requirements for services to enhance the Redstone Rocket," AR Tab 9 at 3, but nonetheless noted a weakness related to training (an enhancement of medium importance), and did not discuss computer equipment enhancements (an enhancement of high importance) at all, *id.* at 3–4. The court is somewhat troubled by the omission of any discussion of the computer equipment enhancements offered by Huntsville, in light of the fact that Huntsville specifically offered to provide "Internet air cards," one of two specific computer equipment enhancements noted in the LRFP, and TVP did not. AR Tab 6 at 9, Tab 15 at 16.

Because the EC did not compare, or even mention, the computer equipment enhancements offered by TVP and Huntsville in its consensus ratings, the court cannot ascertain if the offerors obtained accurate ratings for this particular aspect of the Services Offered evaluation criteria, noted to be of high importance. The only conclusion that the court can draw from this record is that the EC failed to diligently apply the medium-importance and high-importance weighting scheme of enhancements set forth in the LRFP. This error might or might not have been significant in the overall Services Offered rating of the two proposals. It is, however,

---

15. TVP's proposal did not include distribution charts of any kind, or a copy of the LRFP's Statement of Work. The LRFP did not require proposals to do more than "address the offeror's plan for compliance with all requirements of" the Statement of Work attached to the LRFP. AR Tab 5 at 1.

16. The court notes that the FAR does not apply to this procurement, although communications with offerors must meet the regulatory standard of objectivity and fairness expressed in 32 C.F.R. pt. 247 App. B(J)(8)(c).

impossible to make that determination under these circumstances.

## C. Past Performance

Although Past Performance was only half as important as either Technical Capability or Services Offered, this evaluation criteria was not of insignificant weight. *See* Tab 5 at 3 (notifying offerors that "[a]ward will be based on an evaluation of the offeror's entire proposal and a past performance assessment"). Past Performance was measured by "successful production of a CE or similar publication including capability to sell advertising and recoup publication costs, printing ability, and timely and responsive contract performance[.]" *Id.* The court notes that TVP received a higher rating for Past Performance than Huntsville, the incumbent contractor for approximately ten years, even though TVP *had never produced* a CE newspaper before. *See* AR Tab 15 at 29 (comments from EC evaluator noting that certain TVP *employees,* not TVP itself, had experience with producing CE newspapers).

Overall, the court does not view the EC's Past Performance ratings of the offerors in this procurement to be based on the LRFP, or to be rational. Turning first to the Past Performance rating received by Huntsville, both weaknesses assigned to Huntsville's proposal are fundamentally flawed. First, the EC looked for "evidence that [Huntsville] operates on a financially sound basis," and determined there was no "real evidence" to satisfy this requirement. AR Tab 9 at 6. The LRFP, however, asks offerors to show evidence of "successful production of a CE or similar publication including capability to sell advertising and recoup publication costs," not evidence of fiscally sound operation. Operating on a "fiscally sound basis" is a concept introduced in the SSP's Evaluation Criteria Set B, not in the LRFP. *See* AR Tab 4 at 12. Huntsville's proposal pointed to ample evidence that it had local advertisers and had successfully produced the Redstone Rocket and other advertising-dependent publications for years—evidence that did not go unnoticed by the EC. *See* AR Tab 15 at 11 (noting Huntsville's "evidence that the[y] have produced successful CE publications" and that

Huntsville was "an established firm"); *see also id.* Tab 9 at 5 (stating that Huntsville "has shown that they are capable of producing a successful CE newspaper as evidenced by their publishing [the] Rocket for the last 10 yrs."). Huntsville's proposal was superior to TVP's in this respect, and no weaknesses could have rationally been assigned to Huntsville for this aspect of Past Performance, when TVP received not a single weakness for the Past Performance criteria.

Defendant and TVP argue that another solicitation provision, the request for "information regarding the publisher's financial ability to publish a CE newspaper," AR Tab 5 at 2, justifies both Huntsville's lower Past Performance Rating and TVP's higher Past Performance rating. Def.'s Reply at 5–6; TVP's Reply at 6–7. The disparity in Past Performance ratings appears to have been triggered by the submission of TVP's corporate balance sheet and other financial information, whereas Huntsville did not include a corporate balance sheet in its proposal. *Compare* AR Tab 8 at 6 *with id.* Tab 9 at 5. In essence, the government and TVP ask the court to combine the LRFP's request for "information regarding the publisher's financial ability to publish a CE newspaper," AR Tab 5 at 2, with the Past Performance criteria of "successful production of a CE or similar publication including capability to sell advertising and recoup publication costs," AR Tab 5 at 3, in order to justify the EC's insistence on "evidence [the offeror] operates on a financially sound basis," AR Tab 4 at 12 (SSP Evaluation Criteria Set B).

This artful argument advanced by defendant and intervenor-defendant does not mask the fact that the EC erroneously required evidence of fiscal soundness as an element of Past Performance, apparently relying in error on Evaluation Criteria Set B. The EC's Past Performance ratings should have been founded on evidence of "*successful production of a CE or similar publication including capability to sell advertising and recoup publication costs,*" the definition of this element of the Past Performance evaluation criteria provided in the LRFP. AR Tab 5 at 3 (emphasis added). The tangential relationship of corporate fiscal health to the specific

ability to produce a successful CE newspaper is not sufficient to show that the EC was merely focusing on a surrogate measure of Past Performance as it assigned strengths or weaknesses to the level of financial information disclosed in the offerors' proposals. The weakness assigned to Huntsville regarding the level of financial information provided was erroneous, and not within the scope of the evaluation criteria stated in the LRFP.[17]

The second weakness assigned to Huntsville was for inadequate "indication of customer satisfaction." AR Tab 9 at 6. Customer satisfaction is again a concept introduced in Evaluation Criteria Set B that is not mentioned in the LRFP. AR Tab 4 at 12. The LRFP should have pointed the EC toward evidence of "successful production of a CE or similar publication ... and timely and responsive contract performance." AR Tab 5 at 3. Huntsville's proposal contained evidence of successful CE publication and timely and responsive performance. To the extent that customer satisfaction is relevant to this aspect of Past Performance, Huntsville's proposal noted awards won for the Redstone Rocket (annually for the past five years), and four awards for a newsletter produced for the Association of the United States Army, in 2003, 2004, 2007, and 2010. AR Tab 6 at 4. TVP, on the other hand, asserted in its proposal that TVP was proud of its customer service and enclosed a copy of an award for a 2010 "Best Presswork" award for one of its publications, the Times Daily newspaper. AR Tab 7 at 2, 22. The court concludes that it was irrational to assign a weakness to Huntsville, while simultaneously assigning a strength to TVP, for

the "timely and responsive contract performance" aspect of Past Performance.[18]

The one strength in Past Performance that appears to have been accurately assigned to TVP is for TVP's experience with publications that are 100% supported by advertising revenue. *See* AR Tab 7 at 6; id. Tab 8 at 6. The court notes, however, that Huntsville's proposal referenced numerous successful publications supported solely by advertising, including the Rocket itself. AR Tab 6 at 4–5. Furthermore, Huntsville's advertising sales team was based close to the Arsenal, and had a decided advantage over TVP in their ability to sell advertising and recoup publication costs. When the court considers the LRFP's description of the Past Performance evaluation criteria, the EC's decision to rate TVP's Past Performance as Superior and Huntsville's Past Performance as Good is irrational.

### D. Management Approach

Although Management Approach was the least-weighted of the evaluation criteria, errors were made in rating the Management Approach factor that might have been influential in the award decision in this case. This evaluation criteria "involve[s] interfacing with the PAO staff, controlling quality and timeliness of the CE newspaper, sale of ads that result in enhancing the publication's image, and ensuring that the contractor's personnel are properly supervised and managed." AR Tab 5 at 3. The clearest example of rating error is found in the EC's praise of TVP's "strong proposed schedule of production/distribution deadlines," which was noted to be a Management Approach strength. AR Tab 8 at 8. The EC further

---

17. Huntsville provided narrative sections of its proposal titled "Financial ability" and "Experience of the publisher in publishing CE newspapers for military or similar commercial endeavors that relied solely on advertising revenue" which appear to the court to be sufficient to satisfy the LRFP's request for financial information, and to justify a strength in the Past Performance sub-factor related to the ability to recoup publication costs through advertising sales. AR Tab 6 at 3–5. The EC's assignment of a weakness to Huntsville's proposal for lack of financial information was thus neither based on the evaluation criteria of the LRFP nor rational.

18. It is hard to explain why the EC described TVP as providing "evidence of awards which further establishes that they are successful in ventures of this type," when one specific award was mentioned in TVP's proposal, and that award was for a daily newspaper, not a CE publication. AR Tab 8 at 6. For Huntsville, a similar inaccuracy should be noted. The EC described Huntsville's weakness as "[n]o indication to customer satisfaction—except for mention of awards that are not dated." AR Tab 9 at 6.

noted that TVP "provides a detailed production deadline schedule which will ensure that the Rocket is printed & delivered on time." *Id.* at 7.

As plaintiff points out, TVP's proposal addressed two steps in the production process (receipt of advertising dummies and receipt of completed pages), and did not discuss a distribution deadline. AR Tab 7 at 8. As defendant appears to concede, TVP's proposal does not present a detailed or strong production/distribution schedule. *See* Def.'s Mot. at 32 (arguing that "[e]ven if [TVP] did not set forth a 'schedule' *per se* "). The court concludes that the EC's assignment of a strength to this aspect of TVP's Management Approach was erroneous.[19]

There are two other problematic aspects of the EC's ratings for Management Approach. First, the EC also praised TVP's Management Approach for "an addition[al] staff members [sic] who will oversee distribution." AR Tab 8 at 7. This positive feature would have been more appropriately counted as part of Services Offered, where an additional staff member responsible for distribution was described as a high importance enhancement. AR Tab 5 at 2. Indeed, the EC had already awarded TVP a strength in Services Offered for this distribution staff person. AR Tab 8 at 4. Furthermore, although controlling the timeliness of the Rocket is indeed important under Management Approach, the EC's evaluation of proposals would not necessarily have been "well-balanced" if two evaluation categories allowed for double-counting of the same proposal feature. 32 C.F.R. pt. 247 App. B Att. 1(A)(2)(b) (noting that a source selection plan should "[e]stablish a well-balanced evaluation structure"). Finally, the court notes that the description of Management Approach in the LRFP focuses on managerial duties and decisionmaking, not staffing. *See* AR Tab 5 at 3 (*"interfacing* with the PAO staff, *controlling* quality and timeliness of the CE newspaper, sale of ads that result in *enhancing* the publication's image, and *ensuring* that the contractor's personnel are properly supervised and managed") (em-

phasis added). For all of these reasons, the EC should not have counted the distribution staff person among the positive qualities of TVP's Management Approach.

Second, there was a strength awarded to TVP for proposing regular meetings with PAO staff. AR Tab 8 at 7–8. Evaluation Criteria Set B suggested that regular meetings between the contractor and PAO staff were desirable: "Does the offeror have regularly scheduled meetings with PAO to review ongoing performance and possible improvements in publication?" AR Tab 4 at 13. The EC appears to have overemphasized this particular type of "interface," and ignored other, substantially equivalent types of interaction between the offeror and the PAO, by relying inappropriately on Evaluation Criteria Set B in the SSP rather than the criteria stated in the LRFP. Huntsville, for example, as the incumbent contractor and the offeror whose combined production and printing facility was located very close to the Arsenal, had established relationships with PAO staff and had the advantage of proximity and longer hours of operation to facilitate the "interface" required by the LRFP. *See* AR Tab 15 at 6 (an evaluator noting that Huntsville's "[i]nterface with PAO Staff already exists"). If regularly scheduled meetings between the contractor and PAO staff were the preferred method of "interface," neither the description of Management Approach nor the Statement of Work presented in the LRFP made this fact known to offerors.

For all of these reasons, the court finds that the EC's rating of TVP and Huntsville for the criteria of Management Approach was seriously flawed. On this record, however, the court cannot discern whether the consensus ratings for Management Approach would necessarily have changed if the EC had not made the errors that it did. Nevertheless, it is clear that the EC inaccurately noted a strength that was not present in TVP's proposal, inappropriately considered a Services Offered strength to also be a Management Approach strength for TVP, and placed what appears to be excessive impor-

---

19. Huntsville, on the other hand, presented numerous production and distribution deadlines in its proposal. AR Tab 6 at 5–6.

tance on a meeting schedule proposed by TVP.

## E. Award Recommendation by the Evaluation Committee

The court assumes, although the record does not conclusively show, that the EC recommended award to TVP.[20] When the court considers the number and gravity of the errors made in establishing the SSP, as well as the number and gravity of the errors made by the EC in evaluating the proposals before it, the consensus ratings produced by the EC are irrational and arbitrary. Those ratings, and the award recommendation implicit in those ratings, are not sufficiently grounded in the evaluation criteria set forth in the LRFP or grounded in accurate and rational evaluation decisions. The court necessarily concludes that, but for the errors committed during the evaluation of proposals, Huntsville had a substantial chance of being recommended for award by the EC. *See, e.g., Beta Analytics Int'l, Inc. v. United States,* 67 Fed.Cl. 384, 407–08 (2005) (invalidating an award based on the cumulative prejudicial effect of numerous evaluation errors). The court now turns to the question of whether the SSA relied on the flawed ratings produced by the EC in his award decision.

## VIII. Arbitrary Award Decision by the Source Selection Authority

The Source Selection Decision Document is a terse report of the award decision by the SSA. Aside from text giving background information, reporting the ratings produced by the EC, and reporting the award decision itself, there are only three paragraphs that describe the "independent judgment" of the SSA. These paragraphs are reproduced here in their entirety:

> **Comparative Assessment.** The adequate rating for The Huntsville Times' Management Approach is based on the lack of details provided with respect to (1) a plan

for interfacing with the PAO staff, and (2) ensuring that the contractor's personnel are properly managed and supervised. Tennessee Valley Printing Co., Inc., (1) proposed scheduling monthly and quarterly meetings in addition to meeting "as needed" to interact with the PAO staff, and (2) provided *"curriculum vitae"* details on its supervisory and management personnel, and stated the organizational reporting structure for its Redstone Rocket staff.

Tennessee Valley Printing Co., Inc. (TVP), received a superior rating for Services and/or Items offered based on the following elements not proposed by the Huntsville Times: TVP offers to produce full color on every page of a publication up to 32 pages; TVP offers to print the publication on bright white 351b paper; TVP proposes to maintain an external website that will be dedicated and branded to the Rocket with rights to domain name belonging to the command; TVP proposes utilizing a currently-owned Digital Billboard on University Drive for promotional purposes; and TVP commits to providing two (2) billboards for three (3) months each in 2011 approaching Redstone Arsenal gates.

Tennessee Valley Printing Co., Inc. (TVP), received a superior rating for its Past Performance/Performance Risk Assessment in part based upon an evaluation of its financial records submitted to support and document the capability to sell advertising and recoup publication costs. The Huntsville Times did not submit supporting financial records documenting its capability to sell advertising and recoup publication costs.

AR Tab 10 at 2–3. The court turns first to an overview of the SSDD, and then to a specific examination of the SSA's rating of Management Approach, Services Offered, and Past Performance.

### A. Overview of the SSDD and the SSA's award decision

The court must determine whether the SSA's decision adopts all, some, or none of

---

20. The SSP instructed the EC to achieve consensus on overall ratings of the proposals, or to produce majority and minority positions on overall ratings, and to produce a report of the EC's findings and recommendations. AR Tab 4 at 11. The AR does not contain such a report, although

it does contain the EC's consensus rating sheets for both proposals. AR Tabs 8–9. These rating sheets communicate adjectival ratings for the four evaluation criteria for each offeror, but do not present the EC's overall rating of the two proposals.

the errors committed by the EC. The SSDD does not state, as a general matter, whether the SSA approved and adopted the specific strengths and weaknesses noted by the EC, but refers the reader to the EC's consensus rating sheets, and reports the EC's adjectival ratings as part of the SSDD. AR Tab 10 at 2. The SSA then proceeds to describe *only* the three evaluation criteria where TVP and Huntsville received different ratings, in a "[c]omparative [a]ssessment." In the SSA's comparative assessment, the SSA reports the differing ratings for Management Approach, Services Offered and Past Performance. The SSA noted, for Management Approach, what Huntsville's "adequate" rating was "based on" and listed TVP's strengths. For Services Offered, the SSA reported that TVP's superior rating for Services Offered was "received" and "based on" a list of proposed elements not offered by Huntsville. Finally, for Past Performance, the SSA revealed that a significant cause of the difference in ratings was due to the differing level of disclosure of "financial records," and implies that this was only a partial explanation of TVP's higher score for this factor.

The court notes that not one adjectival rating awarded by the EC was rejected by the SSA. The SSA did not discuss individual strengths and weaknesses of the two proposals in Technical Capability, and failed to reveal the entire basis of the scores in Past Performance. On this record, the SSA endorsed the EC's adjectival ratings for all four criteria, and specifically adopted the consensus ratings and comments of the EC for Technical Capability and, at least in part, for Past Performance, because he relied upon the EC's consensus rating sheets for those two criteria. The court concludes that all of the errors committed by the EC in rating Technical Capability and Past Performance were adopted by the SSA.[21] Because the court has found that the EC's rating of Technical Capability did not follow the evaluation

criteria in the LRFP, and because the EC's rating of Past Performance disregarded the criteria stated in the LRFP and was irrational, these significant errors are enough to significantly compromise the award decision produced by the SSA.

The court notes one additional error committed by the SSA. The SSA stated that the four evaluation criteria, Technical Capability, Services Offered, Past Performance and Management Approach, "are [listed] in descending order of importance." AR Tab 10 at 1. The LRFP, however, informed offerors that Technical Capability and Services Offered were approximately equal in importance, and did not suggest that Technical Capability was more important than Services Offered. AR Tab 5 at 3. The SSDD also contained a second statement of evaluation criteria weighting, which reported that Technical Capability and Services Offered were approximately equal in importance. AR Tab 10 at 1. The SSDD, just like the SSP relied upon by the EC, contained conflicting statements of the weight to be accorded the evaluation criteria. The SSDD announced a weighting scheme for evaluation criteria that was neither internally consistent nor a faithful rendition of the weighting scheme set forth in the LRFP. As stated *supra*, there is no evidence that the SSA applied any weighting scheme to the evaluation criteria. In the circumstances of this procurement, the confusion of weighting schemes and the absence of any application of the evaluation criteria weighting scheme presented to offerors in the LRFP constitute significant error.

**B. The SSA Avoided All of the EC's Evaluation Errors in Rating Management Approach, But Erred, in At Least One Instance, in Rating Services Offered**

### 1. Management Approach

The court finds no fault with the SSA's decision to endorse an adequate rating for

---

21. The ratings given to the proposals for Past Performance by the SSA include an unjustified reliance on "financial records," which, as discussed supra, were not within the scope of the Past Performance evaluation criteria stated in the LRFP, and were not determinative of the ability to recoup publications costs from advertising sales for a CE newspaper. For the SSA to rate TVP higher than Huntsville on documenta-

tion relevant to the "successful production of a CE or similar publication," AR Tab 5 at 3, was irrational. Furthermore, because of the SSA's oblique reference to other, unstated reasons for rating TVP above Huntsville in Past Performance, the record forces the inference that the SSA relied upon the EC's other Past Performance rating errors.

Huntsville's Management Approach and a good rating for TVP's Management Approach. Huntsville's proposal could rationally be faulted for "the lack of details provided with respect to (1) a plan for interfacing with the PAO staff, and (2) ensuring that the contractor's personnel are properly managed and supervised." AR Tab 10 at 2. Similarly, TVP's proposal could rationally be rated as good for having "(1) proposed scheduling monthly and quarterly meetings in addition to meeting 'as needed' to interact with the PAO staff, and (2) provided '*curriculum vitae*' details on its supervisory and management personnel, and stated the organizational reporting structure for its Redstone Rocket staff." *Id.* Because these strengths and weakness are grounded in evaluation criteria stated in the LRFP, and rationally represent a comprehensive comparative assessment of this aspect of the proposals, the court finds that the SSA's comparative assessment of the Management Approach criteria was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The court notes, however, that Management Approach was the least important of the evaluation factors, and thus the difference in the offerors' ratings for Management Approach should have been accorded relatively little weight in the award decision.

### 2. Services Offered

The SSA found that TVP "received a superior rating" because it had offered the following services (and Huntsville had not): "TVP offers to produce full color on every page of a publication up to 32 pages; TVP offers to print the publication on bright white 351b paper; TVP proposes to maintain an external website that will be dedicated and branded to the Rocket with rights to domain name belonging to the command; TVP proposes utilizing a currently-owned Digital Billboard on University Drive for promotional purposes; and TVP commits to providing two (2) billboards for three (3) months each in 2011 approaching Redstone Arsenal gates." AR Tab 10 at 2. There is one rating error

contained in this list—as described *supra*, TVP did not merit a strength for offering to print on bright, non-recycled paper. In other respects, the remaining strengths are rationally related to the evaluation criteria set forth in the LRFP. It is unclear whether this list of strengths provides a comprehensive rating for Services Offered for the two offerors, but the court finds that the reference to the EC's consensus ratings for Services Offered, and TVP's strengths listed in the SSDD, even without the erroneous strength for the offer of recycled paper, could rationally support a superior rating for TVP's Services Offered, and a good rating for Huntsville's Services Offered.[22] For this reason, the court finds that the SSA's comparative assessment of the Services Offered criteria was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### IX. Significantly Flawed Award Decision and Prejudice to the Protestor

The court has closely examined this procurement and found (1) procedural errors in establishing the SSP; (2) a confusing and internally inconsistent SSP; (3) ratings that were based on evaluation criteria different from those stated in the LRFP; (4) ratings that were irrational or were in violation of the governing regulation; and (5) a failure to apply the weighting scheme for evaluation criteria set forth in the LRFP. These errors are significant, and the court finds that the decision to award this contract to TVP was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote*, 365 F.3d at 1350–51 (quoting *Advanced Data Concepts*, 216 F.3d at 1057–58). The SSA's award decision, although rational, in the main, as to the different ratings assigned to Huntsville and TVP in Management Approach and Services Offered, was arbitrary and capricious in the remainder of its assessment of proposals. These errors are too significant to disregard as harmless or *de minimis* errors.

---

**22.** It is true that the EC's ratings for Services Offered also contained an inappropriate weakness for the varying distribution figures in Huntsville's proposal, and a flawed assessment of service enhancements. *See supra.* Nonetheless, the correction of these errors would not appear to be of enough importance to change the SSA's preference for TVP's Services Offered.

The parties dispute whether Huntsville was prejudiced by the procurement errors committed by the Army. The question is not whether Huntsville has proved that it would have received the award but for these procurement errors. *See, e.g., Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.") (citations omitted). The question here is whether Huntsville has shown that it had a substantial chance of receiving the contract award for the Redstone Rocket, if the procurement errors had not occurred. *Bannum,* 404 F.3d at 1358.

As discussed above, this was a fundamentally flawed source selection process. In a procurement organized in accordance with the governing regulation, the EC could have and should have developed a logical SSP based solely on the evaluation criteria in the LRFP, and in those circumstances, there was a substantial chance the EC would have recommended award to Huntsville. The EC, even operating under the flawed SSP discussed in this opinion, could have and should have made rational assessments regarding proximity, staffing, ability to produce a CE publication based on advertising revenues, paper stock, responsive contract performance and production/distribution schedules, and, once the four evaluation criteria had received the correct weighting, the EC might have concluded that Huntsville offered the most advantageous proposal. The SSA could easily have chosen Huntsville for award under either of these scenarios. The court is satisfied that Huntsville had a substantial chance of award, and was prejudiced by the procurement errors discussed in this opinion. Because Huntsville has prevailed on the merits, the court turns to the factors governing injunctive relief.

## X. Injunctive Relief Factors Weighed

As the Federal Circuit has stated,

In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir.2004) (citation omitted). Here, plaintiff has succeeded on the merits. Further, losing this contract has caused and will continue to cause Huntsville irreparable harm, because loss of the opportunity to fairly compete for this contract cannot be remedied other than by means of injunctive relief. *See, e.g., Hosp. Klean of Tex., Inc. v. United States,* 65 Fed.Cl. 618, 624 (2005) ("Here, absent injunctive relief, [the protestor] will lose the opportunity to earn the profit it would have made under this contract. Such loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm.") (citations omitted); *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 744 (2000) (holding that the "potential loss of valuable business" may constitute irreparable harm). Plaintiff attributes "approximately [ ] in annual revenue," and [ ]% of Huntsville's profit to the publication of the Redstone Rocket, figures which are not challenged by defendant or intervenor-defendant.[23] Pl.'s Mot. at 36. Thus, plaintiff has met the first two criteria for receiving a permanent injunction.

As to the balance of hardships, the court must rank the hardships borne by TVP and Huntsville as approximately equal, and those borne by the government as less onerous.

---

**23.** The court acknowledges defendant's argument that not all instances of lost profits constitute irreparable harm. *See* Def.'s Mot. at 34–35. Here, however, as became apparent through consideration of plaintiff's initial motion for a temporary restraining order and preliminary injunction, plaintiff reaped both profits and other benefits from publishing the Redstone Rocket.

Thus, even if plaintiff's lost profits did not by themselves constitute irreparable harm, a proposition with which the court disagrees, plaintiff's business as a whole is adversely impacted by the loss of this contract and the totality of circumstances constitutes irreparable harm to Huntsville.

Both publishers would be affected by the uncertainty of a new or revived competition for the Redstone Rocket contract. Huntsville would continue to experience lost profits and other negative effects on its business, while TVP's investments in producing the Rocket might be forgone.[24] The government would, of course, bear the burden of any interruption in publication and the burden of reprocurement costs. The court views the government's losses as being less burdensome than those of either TVP or Huntsville. On this record, the court views the balance of hardships to weigh very slightly against the issuance of an injunction.

Finally, as to the public interest, the court views this factor as unquestionably favoring injunctive relief in this case. The Army has a responsibility, as stated in 32 C.F.R. pt. 247, to award CE publication contracts objectively and fairly, utilizing evaluation procedures that closely parallel the evaluation criteria stated in the request for proposals. Full and open competition and the preservation of confidence in the fairness of government contract awards cannot otherwise be maintained. *See Metcalf Constr. Co. v. United States*, 53 Fed.Cl. 617, 645 (2002) (noting the twin goals of preserving "public confidence and competition in the federal procurement process") (citation omitted). The standards which ensure that the Army would receive the most advantageous proposal, and that offerors would receive fair treatment in this competition, were not observed. The public interest, in these circumstances, is best served by enjoining the award to TVP.[25]

## XI. Nature of the Permanent Injunction

■■■ When the injunctive relief factors are weighed together, the court concludes that a permanent injunction must issue. The award of Contract No. W9124P–10–R–A001 must be set aside. The court has considered a variety of solutions to the hardships faced by Huntsville, TVP and the Army in the wake of a permanent injunction. In the court's view, the injunction must be timed to take effect on May 23, 2011. This timing should allow for an orderly transition and a fair opportunity to compete for the remaining six months of the first year of contract performance (and the follow-on option years) improperly awarded to TVP, if the Army chooses to award a new contract for the publication of the Redstone Rocket.

The court does not set any restrictions on the Army's options for the re-solicitation of proposals, or for the re-evaluation of proposals received under Letter Request for Proposals W9124P–10–R–A005. The court notes, however, that a related protest would be reviewed under the standards referenced in this opinion. The Clerk's Office will assign a related protest to the undersigned.

## CONCLUSION

Accordingly, it is hereby **ORDERED** that

(1) Defendant shall **FILE** a complete version of the administrative record of this procurement (three copies in CD–ROM format), which includes Tab 4, on or before **March 25, 2011;**

(2) Plaintiff's Motion for Judgment on the Administrative Record, filed December 16, 2010, is **GRANTED;**

(3) Defendant's and Intervenor–Defendant's Cross–Motions for Judgment on the Administrative Record, filed December 30, 2010, are **DENIED;**

(4) Plaintiff's Request for Permanent Injunctive Relief, filed December 16, 2010, is **GRANTED as follows:**

The United States, by and through the Department of the Army, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from obtaining per-

---

**24.** The court notes that the parties contest whether the Army would have some financial responsibility for TVP's contract-related expenses in the event of contract termination.

**25.** The court has considered the potentially disruptive impact of an injunction on the publication and distribution of the Redstone Rocket. The court notes that defendant argued that cessa-

tion of publication of the Redstone Rocket for a short period of time was one of the options considered by the Army when this protest was filed, if the court enjoined performance by TVP. On this record, the public interest in uninterrupted publication of the Redstone Rocket does not outweigh the public's need for confidence in the integrity of government contracting.

formance from Tennessee Valley Printing Co., Inc. on **Contract No. W9124P–10–R–A001** after **May 23, 2011;**

(5) The Clerk's Office is directed to **ENTER** final judgment in favor of plaintiff;

(6) On or before **March 31, 2011,** counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter;

(7) The Clerk's Office is directed to **ASSIGN any related protest regarding a solicitation of proposals or contract award for the publication of the Redstone Rocket to the undersigned; and**

(8) Each party shall bear its own costs.