**BAYFIRST SOLUTIONS, LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**Veteran Solutions, Inc., Intervenor-defendant.**

**No. 11–516 C.**

United States Court of Federal Claims.

Jan. 9, 2012.[1]

1. This opinion was issued under seal on December 13, 2011. Pursuant to ¶ 5 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. Brackets ([ ]) identify the redacted portions of this opinion.

Lawrence Block, Washington, DC, for plaintiff.

Richard P. Schroeder, United States Department of Justice, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Scott D. Austin, Assistant Director, Washington, DC, for defendant. Luisa M. Alvarez, United States Department of State, Rosslyn, VA, of counsel.

Eric S. Lipsetts, Annapolis, MD, for intervenor-defendant.

## OPINION AND ORDER

BUSH, Judge.

BayFirst Solutions, LLC (BayFirst) filed its post-award bid protest complaint on August 15, 2011. In its complaint, BayFirst challenges the April 25, 2011 award of a contract by the United States Department of State (Agency) to Veteran Solutions, Inc. (VSI), pursuant to Solicitation No. SAQMMA10–R–0331. The contract is for "Diplomatic Security Protection Management Services," Compl. ¶ 1, and consists of the provision of contractor personnel to assist in the program management of personal security in overseas operations of the Agency. BayFirst seeks a permanent injunction and declaratory relief.

The administrative record (AR) of this procurement was filed on September 9, 2011, and the AR was supplemented on October 4, 2011. Briefing was filed according to an expedited schedule and oral argument was held on November 18, 2011. As discussed below, the Agency's award decision was arbitrary and capricious. Defendant's and intervenor-defendant's motions for judgment on the administrative record are therefore denied, and plaintiff's motion for judgment on the administrative record is granted.

## BACKGROUND

### I. The Solicitation

#### A. The Work Requirement

This service contract, for one base year and four option years, would provide the Department of State with support personnel: "The Contractor shall provide the Department of State (DOS) service support to the Bureau of Diplomatic Security's (DS) Office of Overseas Protective Operations. The Contractor shall provide the necessary ser-

vices, personnel, facilities, and his/her best efforts to perform work described in [the solicitation's statement of work]." AR at 157. The services to be provided are described in the statement of work as "Professional Security Management," "Financial Management," "Acquisition Management," "Administrative Staff," and "Information Management." *Id.* at 172–73. There were nineteen contractor personnel positions which were required to be filled at the commencement of the contract, of which nine were "key personnel" positions. *Id.* at 173–208. Interestingly, in the statement of work, the offeror's plan for filling the *key personnel* positions by the contract start date was emphasized: "The Contractor shall provide a plan demonstrating how they will recruit, employ, and retain sufficient qualified persons to fill the *key personnel* positions as of the start-up date of the contract." *Id.* at 173 (emphasis added).

The work requirement for the solicited contract, which is set aside for "Competitive 8(a)" contractors, AR at 150, is currently being performed by the incumbent contractor, Harding Security Associates (HSA). Indeed, the record shows that the solicitation was issued after HSA was acquired by another business entity and no longer qualified as a small business to continue its performance on a contract set aside for small businesses. *Id.* at 32. Because of the paramount need for assistance with "contracts for guard services in Baghdad, Iraq and Kabul, Afghanistan" and other tasks, the Agency attempted to ensure that HSA "incumbent" personnel would continue to serve in their current positions as the new contract was awarded and beyond. *See id.* at 33–34 (noting that "it is a requirement of [the Agency] that all current employees of HSA be offered a position under any new contract through a Right of First Refusal of Employment clause"). In fact, the solicitation included a "right of first refusal" requirement for HSA incumbent employees. *Id.* at 172, 232.

### B. Proposal Submission Requirements

Section L of the solicitation provided offerors with guidance as to the requisite content of their proposals, which would include tech-

nical data as well as price information. Resumes were required for current employees who were being proposed to work on the contract, while resumes and employment agreements were required for other proposed contractor employees who did not yet work for the offeror. AR at 254, 257–58. There is no mention in Section L of the requirement to include a description of the offeror's plan to recruit *key personnel*, as was noted in the solicitation's statement of work. Instead, there were more general requirements for the submission of resumes, employment agreements, descriptions of management procedures and evidence of transition planning. *See id.* at 256–62. In addition, to demonstrate experience on similar contracts, the offeror was instructed to provide contact information and other pertinent details regarding past or current contract performance. *Id.* at 259–60.

### C. Evaluation Procedures

Section M of the solicitation set forth the criteria that were to be used to evaluate proposals, in order to award the contract to the proposal presenting the "best value" to the Agency. AR at 264. As is typical for best value awards, the Agency was to make a tradeoff between price and non-price evaluation factors. *Id.* This section of the solicitation was not a model of clarity, but the weighting of criteria was discussed in some detail. There were three evaluation factors: technical, past performance, and price. *Id.* The technical factor was more important than past performance, and together, the technical and past performance factors were "significantly more important" than price. *Id.*

Somewhat confusingly, the solicitation then discussed the evaluation factors again, in a chart. This chart presented a different statement of the evaluation factor weighting scheme, which could, with effort, be harmonized with the weighting scheme presented on the previous page of the solicitation. In the chart, three evaluation factors were identified and were said to be "listed in descending order of importance": technical, past performance, and price. AR at 265. Thus, while the previously-presented weighting

system noted that the technical and past performance factors, when combined, were significantly more important than price, now the offeror must also conclude that price was less important than either the technical or the past performance factor. To add further confusion, the solicitation also listed two sub-factors, Management Plan and Transition Plan, under the technical factor, in a chart which noted that *evaluation factors* were listed "in descending order of importance." *Id.* Whether these evaluation sub-factors, too, were listed in descending order of importance, cannot be determined with any certainty by reading Section M of the solicitation.

Although the offerors had to decipher the solicitation with no further guidance, the Source Selection Evaluation Plan (SSEP), an internal Agency document, clarified the weighting of the Management Plan and Transition Plan sub-factors and noted that the Management Plan was more important than the Transition Plan.[2] AR at 130. The court notes, further, that the SSEP and the solicitation contain different charts explaining the weighting of the evaluation factors. *Compare id.* at 129 *with id.* at 265. It is troubling to contemplate that the Agency's evaluation team appears to have proceeded with a different evaluation criteria weighting scheme than the one presented in the solicitation.[3]

2. According to 48 C.F.R. § 15.203(a)(4) (2010), the relative importance of evaluation sub-factors must be disclosed to offerors in this type of solicitation. Indeed, when the relative importance of evaluation sub-factors is not identified, caselaw indicates that the sub-factors should be given equal weight. *See, e.g., Isratex, Inc. v. United States,* 25 Cl.Ct. 223, 228–29 (1992) ("When no indication of relative importance is given, an offeror can assume that the subfactors will be equally weighted.") (citations omitted). The solicitation reviewed here contained numerous drafting errors which reduced clarity and frustrated the regulatory imperative of achieving full and open competition for government contracts.

3. Such an error, if prejudicial to BayFirst, might constitute grounds for enjoining the contract award. *See CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 728 (1987) (noting that if the government "utilized the evaluation criteria listed in the SS[E]P rather than the RFP, and if the SS[E]P evaluation factors were significantly different from the RFP evaluation factors (in

## II. The Award Decision

### A. The Technical Evaluation Panel Report

Seven proposals were received in response to the solicitation, but four offerors were eliminated from consideration because their proposals were deemed to be technically unacceptable. AR at 1176. Of the remaining three offerors, BayFirst and [ ] were rated Marginal overall for their proposals, whereas VSI received an Excellent overall rating. *Id.* The Technical Evaluation Panel (TEP) recommended award to VSI. *Id.* at 1177. The court will discuss this severely flawed recommendation *infra.* It is important to note that the contractors who are now the plaintiff and intervenor-defendant in this suit each teamed with a subcontractor for the purpose of this competition: BayFirst's subcontractor was HSA, the incumbent contractor; VSI's subcontractor was TigerSwan Inc. (TSI).

### B. The Source Selection Decision

The Source Selection Decision (SSD), titled Quality Assurance and Legal Review Award Recommendation, adopted the recommendation of the TEP as to the overall technical ratings of proposals, and performed a tradeoff between the technical ratings and prices of proposals.[4] AR at 1199–1200.

terms of content and/or relative importance), then [the protestor] would be entitled to relief assuming that it was prejudiced by such actions.") (citations omitted), *aff'd,* 854 F.2d 464 (Fed.Cir.1988).

4. The Source Selection Authority (SSA) did not prepare the SSD, but signed the document under the rubric "SSA Approval/Concurrence." AR at 1201–02. The SSA provided no statement within or attached to the SSD that explained his award decision. The court notes that pursuant to 48 C.F.R. § 15.308 (2010), the source selection decision "shall represent the SSA's independent judgment." There is some question whether a mere signature shows that an SSA exercised independent judgment in conformance with this regulation. *See, e.g., Info. Scis. Corp. v. United States,* 73 Fed.Cl. 70, 121 (2006) (stating that section 15.308 "requires evidence of the exercise of independent judgment," which was not met in that case because the SSA did not indicate why he adopted certain evaluation ratings and rejected others).

Even though BayFirst's and [ ]'s proposals were lower in price than VSI's proposal, these proposals were not considered to provide the best value to the Agency.[5] *Id.* Award, without discussions, was made to VSI on April 25, 2011. *Id.* at 1217.

## III. Procedure

BayFirst filed a timely protest with the Government Accountability Office (GAO) on May 5, 2011. AR at 1338. During the course of the GAO proceedings, it became clear that one of the Past Performance Questionnaires (PPQs) that was solicited from a reference for BayFirst had been received, via email, by the Agency, but the email had been quarantined on the Agency's server and had not been considered by the Agency during the technical evaluation process. *See* AR at 1475–83, 1592 n. 1. GAO denied BayFirst's protest on August 11, 2011. On August 15, 2011, BayFirst filed a protest in this court. The government agreed to stay performance of the contract awarded to VSI until this protest was resolved.

## DISCUSSION

### I. Bid Protest Jurisdiction

■ This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002) (citation omitted).

## II. Standard of Review for Judgment on the Administrative Record

■ Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356–57 (Fed.Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

## III. Bid Protest Review

■ The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC,* 316 F.3d at 1319. Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE*)). Bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE,* 258 F.3d at 1302). A protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement, and has standing before this court. *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307–08 (Fed.Cir.2006) (citations omitted).

■ As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [ (2006) ]: a reviewing court shall set aside the agency action if it is 'arbitrary, capri-

---

5. The prices of the proposals received in response to the solicitation, as evaluated by the Agency, ranged from approximately fifteen million dollars to nineteen and a half million dollars. AR at 1199. VSI's proposal was evaluated to cost almost two million dollars more than BayFirst's proposal, a price premium of approximately thirteen percent. *Id.*

cious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085–86 (Fed.Cir.2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed.Cir.2001)). "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." *Advanced Data Concepts*, 216 F.3d at 1058.

■■■ *De minimis* errors in the procurement process do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir. 1988)). Examples of arbitrary and capricious agency action include when "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed.Cir.2009) (*Alabama Aircraft*) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)) (alteration in original). The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (citation omitted).

■■■ " 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] ... it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement errors of the agency, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## IV. Standing

Only a protestor possessing a substantial chance of winning the contract has a direct economic interest in the procurement and thereby standing before this court. *Rex Service*, 448 F.3d at 1307–08. Neither defendant nor intervenor-defendant challenges BayFirst's standing to bring this protest. Here, BayFirst offered the lowest-priced proposal, and had better access to the incumbent HSA employees than any other offeror. But for the procurement errors alleged in the complaint, BayFirst had a substantial chance of receiving the contract award. For this reason, BayFirst has standing to bring this bid protest.

## V. Plaintiff's Challenge

Plaintiff attacks the Department's award decision on seven grounds:

[T]he Agency (a) failed to determine that the awardee's failure to provide resumes of the incumbent employees, to provide resumes that met the minimum requirements under the Solicitation and to provide required information on its past performance

made the awardee ineligible under the terms of the Solicitation, (b) improperly and unreasonably evaluated BayFirst's technical proposal including past performance, (c) improperly and unreasonably evaluated the awardee's technical proposal including the awardee's past performance, (d) failed to evaluate all documents provided to the Agency in support of BayFirst's past performance, (e) evaluated BayFirst differently and under different requirements from those applied to the awardee, including subjecting BayFirst to requirements not found in the Solicitation, (f) failed to document its decision-making, and (g) failed to conduct a proper price/technical tradeoff analysis.

Pl.'s Mot. at 4–5. Both defendant and intervenor-defendant argue that even if some of the errors alleged by plaintiff did occur, BayFirst was not prejudiced by those errors and is thus not entitled to relief from this court. *See* Def.'s Mot. at 44 (positing that "even if BayFirst could establish success upon the merits, ... it does not seem plausible that [the Agency] would award a contract to BayFirst based upon its proposal"); VSI's Mot. at 32 (stating that "even if there were errors in VSI's proposal, and in the government's description of the evaluation process, BayFirst cannot show that those errors were prejudicial"). The court turns now to a brief review of the most significant and prejudicial errors committed by the Agency in this procurement.[6]

## VI. Analysis

### A. Technical Factor Ratings

 The court defers to the Agency's expertise in the technical factor ratings as-

signed to the offerors' proposals. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996) ("[T]echnical ratings ... involve discretionary determinations of procurement officials that a court will not second guess."). However, the court cannot approve technical ratings that run counter to the evidence in the record. *Alabama Aircraft,* 586 F.3d at 1375 (citation omitted). Furthermore, the court must review the technical ratings assigned by the Agency not through the lens of post-hoc rationalizations, but by examining the contemporaneous evaluation record.[7] *See Rig Masters, Inc. v. United States,* 70 Fed.Cl. 413, 424 (2006) ("We review the materials before the agency when it made its procurement selection and cannot accept any 'post hoc rationalizations' offered as the basis for the decision.") (citation omitted). Finally, the court notes that this court may not affirm an improperly justified evaluation rating simply because a rational basis for that evaluation rating might otherwise exist.[8] *See OMV Med., Inc. v. United States,* 219 F.3d 1337, 1344 (Fed.Cir.2000) (citing *Bowman,* 419 U.S. at 285–86, 95 S.Ct. 438 and *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)).

### 1. Management Plan

VSI received an Excellent rating for its Management Plan, whereas BayFirst received a Marginal rating for its plan. To receive an "Excellent" rating, a plan must "offer[ ] one or more strengths and [have] no apparent weaknesses."[9] AR at 123, 1175, 1196. The eight components of a Manage-

---

6. The briefing in this bid protest was extensive and very detailed. Less important disputes have been considered by the court, but are omitted from this opinion for the sake of brevity.

7. The administrative record in this case presents two documents containing such post-hoc rationalization and inexplicably includes them in the "pre-solicitation" section of the record, even though each document was authored well after the contract was awarded. *See* AR Tabs 1–2.

8. The Agency destroyed all individual evaluator rating sheets based upon discretion exercised by the contracting officer. Def.'s Reply at 29–31. Thus, the record provides only a cursory summary of the reasoning employed by the Agency

during the evaluation process, despite a cautionary warning set forth in the SSEP regarding the potential importance of retaining documentation such as rating sheets. AR at 115. The Agency may wish to reconsider its document retention policies in future procurements.

9. In a document created in response to the GAO protest, the contracting officer stated that the TEP assigned an Excellent rating if a proposal approach "offer[ed] one or more strengths and few or no weaknesses." AR at 10. It is unclear why the contracting officer, the person who authored the Source Selection Decision, later asserted that an Excellent rating could be obtained even if a proposal component exhibited a few

ment Plan that were evaluated were: (1) Organization and Management; (2) Inspection System; (3) Personnel (evidenced through resumes, employment agreements and qualification statements); (4) Training Program; (5) Personnel Action Prevention; (6) Absenteeism; (7) Personnel Recruitment/Retention; and (8) Experience in Use and Maintenance of the Property Used in Performance of this Contract. *Id.* at 119–21. Only the Personnel component of the Management Plan evaluations is hotly disputed in this protest.

VSI received three strengths and no weaknesses for its Management Plan. One of those strengths, Personnel, was discussed twice by the TEP: (1) "VSI provided resumes for key personnel and for other positions that showed significant experience necessary per the requirements of this RFP."; (2) "VSI provided resumes for all key personnel and for other positions requested under the solicitation. The individuals proposed *all* met the significant experience as it related to the position qualifications stated in the solicitation, and this fact indicated to the Panel that the Offeror would be able to provide the necessary staffing at contract commencement." AR at 901–02 (emphasis added). In the TEP report, the panel again stated that VSI's resumes "showed significant experience necessary per the requirements of this RFP." *Id.* at 1177.

■■■ As plaintiff points out, four of the resumes provided by VSI do not meet the requirements set forth in the solicitation.[10] In each instance, the proffered resume does not show that the minimum education and experience requirements for the position have been met. *See* Pl.'s Reply at 5–12. The court has considered the arguments suggest-

ing that the Agency's faulty reading of VSI's resumes should be excused, and finds them unavailing. Defendant's creative argument, Def.'s Mot. at 16, that work experience at the same job may be double-counted as general and specialized experience to meet minimum requirements in both categories of experience is not supported by any rational reading of the solicitation. *See* AR at 173 (explaining that years of specialized experience should be counted only once, not double-counted as both education substitutes and specialized experience). The court finds that the TEP erroneously concluded that all of the resumes submitted by VSI met minimum requirements for education and experience, and erroneously gave a strength to VSI for the Personnel component of its Management Plan.[11]

It is clear from the record that the TEP assigned risks or weaknesses to other offerors' proposals when their proffered resumes failed to show minimum levels of education or experience. *See* AR at 1181 (resume inadequacies a risk—offeror, [ ] ), 1183 (resume inadequacies a risk—offeror, [ ] ), 1187 ("fail[ure] to provide resumes for personnel that demonstrated significant experience needed for this RFP" a weakness—offeror, [ ] ). BayFirst was not assigned a strength for Personnel despite having presented resumes with the requisite experience, *see supra* note 11, whereas VSI was assigned a strength for Personnel despite having included resumes that clearly did not meet all requirements. This constitutes either disparate treatment of offerors, or an irrational evaluation of VSI's and BayFirst's proposals. The court finds that the Management Plan ratings for VSI and BayFirst were arbitrary and capricious.[12]

weaknesses, when the definition of an Excellent rating used throughout the evaluation and award process only provided for an Excellent rating if no apparent weaknesses were present.

10. Only one of the four inadequate resumes was submitted for a key personnel position. Of the remaining three resumes, only two were submitted for positions required to be filled at contract start-up.

11. BayFirst was given no strengths for the Personnel component of its Management Plan, even though BayFirst proposed the resumes of numer-

ous incumbent HSA employees who were performing in key personnel positions at the time. *See* AR at 368–410. Indeed, the TEP noted that BayFirst's resumes "clearly demonstrate the significant experience required to perform [the contract]." AR at 556.

12. If the inadequate resumes proffered by VSI constituted an apparent weakness, such as the one assigned to [ ], VSI should not have received an Excellent rating for its Management Plan. *See* AR at 1196 (stating that an Excellent rating means the proposal's "approach offers ... no apparent weaknesses").

## 2. Transition Plan

There is some obvious conceptual overlap between the Management Plan sub-factor and the Transition Plan sub-factor. For example, resumes could influence the rating for the Transition Plan sub-factor, even though resumes were a component of the offeror's Management Plan as well. *See* AR at 903 (discussing VSI's resumes under the Transition Plan sub-factor), 1187 (assigning a weakness for an offeror's Transition Plan because of the resumes submitted). The particular focus of the Transition Plan evaluation, however, was on the offeror's schedule of transition period milestones, and evidence of a "well-thought out plan ready to be implemented upon contract award." *Id.* at 134.

■■■ The TEP awarded VSI an Excellent rating for its Transition Plan, and awarded a Marginal rating to BayFirst for its Transition Plan. These ratings are flawed. First, there is an opaque and illogical paragraph attempting to point out a contradiction in BayFirst's staffing plan for the first year, and assigning a weakness for this "contradiction." The court reproduces this paragraph in its entirety:

> [BayFirst] also states ... that the plan is "for the transfer of four senior employees on the program from HSA to [Bay-First]...." The proposal then states that in order to maximize contract stability and minimize performance risk through [Bay-First's] first full year managing the contract, conversions from HSA to [BayFirst] will be limited to these four individuals, which implies the remainder of the HSA staff will remain employed with HSA for the remainder of the first year of the contract. This represents a contradiction in [BayFirst's] Staffing Approach.

AR at 558. Because this "contradiction" is not explained in the record before the court, this weakness assigned by the TEP to Bay-First's Transition Plan cannot be said to be rational.[13] Thus, BayFirst's Marginal rating for this sub-factor is already suspect because

one of two weaknesses assigned by the TEP has no rational basis.

As to the other weakness assigned to Bay-First's Transition Plan, it appears to derive from the TEP's skeptical response to Bay-First's claim that it could retain one hundred percent of HSA incumbent employees, because HSA was the subcontractor for Bay-First. *See* AR at 558 (assigning a weakness to BayFirst's Transition Plan because "there is no guarantee that the [incumbent] individuals that were proposed by [BayFirst] would in fact be available under the contract"). The TEP also faulted BayFirst for having retention letters for only some of the HSA incumbent employees. *Id.* at 557–58. To place this weakness in perspective, it must be noted that the TEP rated VSI's Transition Plan "Excellent," in part because VSI's plan "includ[ed] aggressive recruiting and retaining of incumbent [HSA] employees," even though not a single resume or employment agreement was submitted for these HSA employees who were soon to be the target of VSI's "aggressive recruiting and retaining." *Id.* at 903.

When weighing these "well-thought out" Transition Plans, AR at 134, it is difficult for the court to justify the Agency's preference for VSI's optimistic "aggressive recruiting and retaining" plan over BayFirst's optimistic promise to retain all of its subcontractor HSA's incumbent employees. The court nonetheless defers to the Agency's "Excellent" rating for VSI's Transition Plan as a whole. Another issue, however, clouds the TEP's Transition Plan ratings. Was the supporting documentation provided by BayFirst and VSI sufficient, pursuant to the requirements set forth in the solicitation, to show that some sort of employment commitment had been obtained from proposed personnel? This, too, was a hotly debated question among the parties.

### a. Incumbent Resumes, Employment Agreements and Retention Letters

The court notes first that the solicitation sections having relevance to the issue of em-

---

13. The court was not convinced by post-hoc rationalizations that any such contradiction existed in BayFirst's proposal. Perhaps an explanation could have been found in the individual evalu-

ator rating sheets that were destroyed by the Agency, but there is absolutely no rational support for this weakness assigned to BayFirst in the record before the court.

ployee commitments are less than clear. The instructions regarding the submission of resumes state that the offeror "shall submit resumes for individuals that it reasonably expects to perform on the contract." AR at 257. Further, these resumes "shall contain a signed statement that the individual grants permission for his/her resume to be submitted for consideration under Solicitation Number SAQMMA10-R-0331." *Id.* Importantly, *subcontractor* employee resumes were not specifically addressed by the solicitation. Both VSI and BayFirst reasonably assumed that the resume submission requirements applied to prime *and* subcontractor employees expected to perform on the contract. *See id.* Tabs 21, 26. The court agrees with the offerors' assumption that resumes were required for proposed personnel, whether these persons were employed by the prime or the subcontractor.

Personnel not currently employed by the prime or subcontractor required additional proof of commitment to the contract proposal. Prospective employees expected to perform on the contract were discussed in Section L of the solicitation in this manner:

> If resumes are provided for individuals not presently in your employ, your employment agreements with those individuals shall be provide[d] with your proposal. Employment agreements must contain specific salary quotations (not salary ranges), and shall be signed within 30 days prior to the date for submission of proposals[.]

AR at 257–58. Thus, considering these provisions together, an offeror should have provided a resume (including a signed statement granting permission for the resume to be used for the proposal) and an employment agreement for all prospective employees reasonably expected to perform on the contract.[14] The exact nature of the employment agreement was unclear, except for the timing of the signature (or signatures) and the need for an exact salary figure.

The court notes that there was no requirement in the solicitation for retention letters from current employees of the prime or subcontractor. There were, however, two provisions specifically addressing the continuing employment of incumbent HSA employees. First, the "right of first refusal" clause described how an awardee must not offer employment to other persons before contacting non-managerial incumbent HSA employees and allowing these incumbents to accept or reject offers of employment from the awardee:

> Consistent with the efficient performance of this contract, the contractor and its subcontractors shall, except as otherwise provided herein, in good faith offer those employees (other than managerial and supervisory employees) employed under the predecessor contract whose employment will be terminated as a result of award of this contract or the expiration of the contract under which the employees were hired, a **right of first refusal** of employment under this contract in positions for which employees are qualified. Except as provided in [a paragraph setting forth limited exceptions,] there shall be no employment opening under this contract, and the contractor and any subcontractors shall not offer employment under this contract, to any person prior to having complied fully with this obligation. The contractor and its subcontractors shall make an express offer of employment to each employee as provided herein and shall state the time within which the employee must accept such offer, but in no case shall the period within which the employee must accept the offer of employment be less than 10 days.

AR at 232. Thus, it is clear that any employment agreement submitted by an offeror for its non-managerial prospective employees would necessarily be a contingent one, pursuant to the solicitation's right of first refusal clause, unless, of course, that employment

---

**14.** The court rejects any reading of the solicitation phrase "individuals not presently in your employ" to include current employees of the offeror's subcontractor. *Cf.* Def.'s Mot. at 25. Such an interpretation is not reasonable, because it presumes that after award, the prime would hire away all of the subcontractor's employees proposed for the contract. Such a presumption is nonsensical.

agreement was with an incumbent HSA employee.

The final solicitation provisions relevant to this dispute were attached to Solicitation Amendment A002 and posted on the FebBizOpps website in the form of the Agency's answers to bidders' questions. Here are two clarifying responses provided by the Agency:

Question 1: Does the Government require resumes for incumbents occupying all positions, namely, existing incumbents in each job category?

Answer: Yes, as well as other individuals that the company expects to perform on the contract.

. . . .

Question 5: Are resume submissions required for all positions listed under the solicitation or just for key personnel as detailed in the solicitation?

Answer: See the answer to question 1.

AR at 296. Amendment A002 thus clarifies that if an offeror reasonably expected incumbent HSA employees to perform on the contract, in key personnel positions or otherwise, that offeror must include resumes for those individuals, along with an employment agreement for those incumbents if they were not currently employed by the offeror (or, in the case of BayFirst, by BayFirst's subcontractor HSA).[15]

### b. VSI's Proposal Did Not Include Incumbent Resumes

It appears that only BayFirst offered resumes for HSA incumbent employees, and the government now argues that VSI was not required to provide resumes for incumbent

HSA employees. Def.'s Reply at 4–6. Defendant asserts that when all of the solicitation's requirements are read together, "[i]f an offeror did not reasonably expect to employ a *particular* incumbent employee, the offeror was not required to submit a resume for that employee." *Id.* at 5 (emphasis added). Although this is a strained interpretation of the guidance provided offerors by the Agency in Solicitation Amendment A002, *see* AR at 296, the government's point is well-taken when all of the solicitation requirements, reviewed *supra,* are read together, and when the need for open competition is considered. *See McNeil Techs., Inc.,* B–278904, B–278904.2, 98–1 CPD ¶ 96, 1998 WL 150352, at *3 (Comp.Gen. Apr. 2, 1998) ("Where a dispute exists as to the meaning of solicitation language, we will resolve the matter by reading the solicitation as a whole and in a manner that gives effect to all provisions of the solicitation.") (citations omitted). For this reason, the Agency was not necessarily required to reject VSI's Transition Plan or assign it a weakness for the lack of incumbent resumes.[16]

This is not to say that VSI's Transition Plan was without flaws. One of the personnel positions due to be filled upon contract award was that of Procurement Analyst Assistant. AR at 195. VSI asserted that it would [ ]. *Id.* at 669. For the same position, BayFirst proposed the incumbent HSA Procurement Analyst Assistant and included her resume. *See id.* at 351, 415–17. The court must conclude that BayFirst's Transition Plan was superior to VSI's plan, at least in this respect. Considered in isolation, the Agency's failure to carefully and fully evalu-

---

**15.** Defendant's position on the status of the Agency's answers attached to Solicitation Amendment A002 was not clear at oral argument. Tr. at 65–66. GAO decisions support the view that such answers, when circulated to all offerors as an attachment to an amendment signed by the contracting officer, constitute an amendment of the solicitation. *See Scientific Research Corp.,* B–260478, B–260478.2, 95–2 CPD ¶ 8, 1995 WL 404157, at *5 (Comp.Gen. July 10, 1995) (stating that "information disseminated during the course of a procurement that is in writing, signed by the contracting officer, and sent to all offerors, meets all the essential elements of a solicitation amendment and will therefore bind both the offerors and the agency")

(citation omitted); *cf. McNeil Techs., Inc.,* B–278904, B–278904.2, 98–1 CPD ¶ 96, 1998 WL 150352, at *4 (Comp.Gen. Apr. 2, 1998) (declining to consider an answer provided potential bidders as an amendment to an RFP because the answer "was never incorporated by amendment into the RFP"). The court concludes that the Agency's answers to bidder questions amended the solicitation.

**16.** Another offeror was assigned a weakness for not including incumbent resumes, AR at 1187, but the record does not include sufficient detail to determine whether that offeror and VSI similarly relied on incumbent personnel.

ate the resumes offered in support of VSI's Transition Plan might be considered to be a minor error.[17]

### c. BayFirst's Retention Letters

The TEP assigned a weakness to Bay-First's Transition Plan in part because Bay-First "did not include retention letters." AR at 557. More specifically, the panel faulted BayFirst because "a majority of the resumes only included permission to use the[ ] resume for the proposal and did not include a retention letter." *Id.* at 558. In the TEP report, this "flaw" was even more highly emphasized: "[BayFirst's] assertion of 100% employee retention is unrealistic due to the fact that permission to use resumes was for the proposal only and did not include retention letters." *Id.* at 1179.

The TEP erred. The solicitation required resumes which included a signed statement granting permission for the resume to be used for the offeror's proposal in response to this solicitation. Instead of acknowledging that BayFirst's resumes met this requirement, the TEP erroneously suggested that BayFirst's resumes were deficient. This assigned weakness shows a fundamental misunderstanding or misapplication of the solicitation's requirements—retention letters were not required by the solicitation, as discussed *supra*. No weakness should have been assigned to BayFirst for including retention letters for some but not all incumbent HSA employees.

The court finds that each of the two weaknesses assigned by the TEP to BayFirst's Transition Plan were irrational, based on the reasoning presented in the record before the court. When these two weaknesses are removed from the evaluation, BayFirst would likely have merited a higher ranking, either Good or Excellent. If the Agency had conducted a rational evaluation based on the solicitation's requirements, the TEP should likely have found at least one strength in BayFirst's Transition Plan which offered the advantages of HSA's incumbency, and should likely have found no apparent weaknesses, or only minor weaknesses. *See* AR at 123 (de-

fining Good and Excellent ratings). For all of the foregoing reasons, the court finds that the "Marginal" rating assigned BayFirst's Transition Plan was irrational, arbitrary and capricious.

### B. Past Performance Ratings

■ The TEP's past performance ratings of BayFirst's and VSI's proposals were the most flawed aspect of this procurement. First, the ratings show disparate treatment of BayFirst and VSI. Second, the ratings evince numerous factual errors, which can only be explained by the Agency's failure to carefully review and evaluate the past performance references in the offerors' proposals and the Past Performance Questionnaires (PPQs) returned by the contact persons who had knowledge of the past contract performances of BayFirst, HSA, VSI and TSI. The disparate treatment and evaluation mistakes, for a factor that the solicitation described as the second most important evaluation factor, AR at 265, invalidate the award to VSI.

#### 1. Disparate Treatment

BayFirst and VSI were treated very differently as to the past performance of their subcontractors. Pursuant to 48 C.F.R. § 15.305(a)(2)(iii) (2010), the procuring agency "should take into account past performance information regarding ... subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition." Thus, since BayFirst and VSI each submitted references for the past contract performance of its subcontractor (HSA or TSI, respectively), a reasonable evaluation would have incorporated such experience into the past performance evaluations in a like manner. Here, however, the Agency's past performance evaluation faulted Bay-First for not showing that it could "perform without a subcontractor," AR at 1179, but assigned VSI its one strength in past performance for TSI's experience as a subcontractor in Iraq, *id.* at 907.

---

**17.** As noted above, resumes and supporting documentation were evaluated both for the offeror's

Management Plan and its Transition Plan.

It is impossible to rationally reconcile these two past performance evaluations. The narrative evaluation of BayFirst's past performance appears to hold BayFirst to a standard not stated in the solicitation, *i.e.*, that a prime contractor must show that it could perform the contract without a subcontractor, whereas VSI was accorded a strength for its subcontractor's past performance in Iraq. Furthermore, when VSI's PPQs indicated excellent past performance on contracts not similar to the contract awarded in this case, this fact was duly, and positively, noted by the TEP in the narrative evaluation summary of VSI's past performance. *See* AR at 906 ("Four of [VSI's] references were not of the size, scope [ ]or complexity of the solicitation; however, VSI was rated Excellent by all which *indicates* successful performance.") (emphasis added).

When, however, a BayFirst or HSA PPQ indicated excellent past performance on contracts not similar to the contract awarded in this case, these contracts were listed in the "weaknesses" section of the evaluation form, and a dismissive comment accompanied each excellent example of past performance: "While these [contract] services were rated Excellent; however, they do not account for the bulk of services required under this RFP." *Id.* at 561. The narrative summary of BayFirst's past performance evaluation did not note excellent performance on dissimilar contracts; instead, the TEP simply noted that "the past performance information contained in the proposal did not clearly indicate that [BayFirst] possesses the past performance experience necessary to perform without a subcontractor." *Id.* at 560. Thus, the TEP treated the offerors' past performance on these less relevant contracts quite differently.

A procuring agency must treat offerors fairly and impartially. 48 C.F.R. § 1.102–2(c) (2010). Here, BayFirst's past performance was rated according to a different standard than VSI's past performance. The court finds that the past performance evalua-tions of BayFirst and VSI show disparate treatment and were arbitrary and capricious.

## 2. Factual Errors in Past Performance Ratings

### a. VSI's Past Performance Ratings

Although defendant asks the court to ignore the mistakes in the Agency's past performance evaluation of VSI, describing these mistakes as "minor discrepanc[ies]" or "incorrect recitation[s]," Def.'s Mot. at 38–39, the record shows that the TEP's past performance evaluation does not reflect the facts before the Agency. The court reproduces here the narrative portion of the evaluation of VSI's past performance:

> The [VSI] proposal included five references for past performance where the Offeror served as the prime. Four of the references were not of the size, scope nor complexity of the solicitation; however, VSI was rated Excellent by all which indicates successful performance. The fifth reference was of the same size, scope and complexity and provided an Excellent rating for performance. The Panel reviewed all the references provided by VSI as well as information provided from the Past Performance Information Retrieval System and assessed the Offeror's past performance as Excellent.
>
> The Panel notes that the past performance information contained in the proposal strongly indicates that VSI possesses the experience necessary to perform with a good probability of success.

AR at 906. The court notes that in the first sentence of this narrative, the word "Offeror" must refer to VSI, because VSI is the offeror whose proposal is being rated. VSI's proposal did indeed present five contract references, but the TEP is completely wrong as to the nature of these references: first of all, three are for VSI as prime; another is for TSI as prime; and, the last is for TSI as a subcontractor in Iraq.[18] *Id.* at 659–65. Apparently, the TEP did not understand the distinctions made in VSI's proposal, in which the past performance references are clearly

---

18. Although intervenor-defendant suggests that the Agency merely "viewed the VSI proposal as a whole," VSI Mot. at 22, this "holistic" view of VSI's proposal does not explain the errors in the TEP's description of the past performance of VSI and TSI, two separate business entities.

divided into two categories: "VSI Past Performance" and "TigerSwan Inc. [TSI] Past Performance." *Id.* at 659, 662. This error is troubling in light of the fact that the Agency evidently was concerned with the distinctions between prime and subcontractor past performance in BayFirst's proposal evaluation.

The second sentence of the narrative is factually correct in only one respect: four contract references presented by VSI were not judged to be similar to the contract at issue here. The TEP erroneously reported, however, that VSI was rated excellent on all four of these less relevant contracts—in fact, only three excellent PPQs for these contracts were received by the Agency. *See* AR at 908–09. No PPQ was received from the fourth contract reference (of these less similar contracts), so the Agency had no basis for determining whether this contract performance was excellent or less than excellent. *See id.*

It is also clear from the evaluation narrative that the fifth contract reference was presumed to be for VSI, and for VSI as the prime contractor, although this subcontract in Iraq was in fact performed by TSI. AR at 906. In the very favorable description of this contract performance, which is cited as VSI's sole strength in past performance, the Agency mistook a TSI subcontract with [ ] for a VSI contract with the United States Army:

VSI performed as the prime [contractor for the Army] providing administrative, logistical, operational, and linguist support to supply and manage qualified personnel in austere locations. Additionally, VSI provides armed security services ( [ ] total personnel) at [ ] work sites throughout Iraq using a combination of staff. Security services provided include armed static guard services, unarmed escort services and armed Protective Security Detail (PSD) services among the various sites throughout Iraq. Work performed under this contract clearly demonstrated a history of successful performance on a contract of similar size, scope and complexity. The

Offeror's performance on this contract was rated as Excellent and was supplemented by an outstanding narrative recommendation on their performance provided by the contract's Iraq Project Manager.

*Id.* at 907. This entire strength, assigned to VSI's past performance, is factually inaccurate because TSI, not VSI, performed these services, and did so as a subcontractor, not the prime contractor. Because of the factual errors invalidating this strength assigned to VSI, and because of the other factual errors in the narrative portion of VSI's past performance evaluation by the TEP, the court finds that the Excellent past performance rating assigned to VSI's proposal was not rational. It might be that the TEP would have awarded a strength to VSI for TSI's performance as a subcontractor in Iraq, but VSI's Excellent past performance rating cannot be supported by the record before the court.[19] *See OMV Medical,* 219 F.3d at 1344 (holding that this court may not justify an award decision for reasons other than those documented by the agency at the time of award).

### b. BayFirst's Past Performance Ratings

Turning to BayFirst's past performance evaluation, there were two factual errors in the ratings accorded by the TEP. The Agency again had difficulty distinguishing between the offeror's and the subcontractor's contract performance. One contract was identified as a weakness by the TEP because BayFirst "acted as a subcontractor" on a contract "not of the same scope, size [ ]or complexity of the RFP." AR at 561. This contract, however, was performed by HSA as the prime contractor, not by BayFirst as a subcontractor. *Id.* at 343–45.

Furthermore, the court notes that the Agency received, via email, a PPQ for BayFirst's past contract performance that was not considered by the TEP in its deliberations. The record indicates that this email was not delivered to the intended recipient

---

**19.** The court notes that an Excellent rating requires at least one strength, AR at 123, and VSI had no other strengths noted by the TEP. Furthermore, VSI neglected to provide dollar values for its past performance contract references, as required by Section L of the solicitation. *Id.* at 259, 659–65. A proper past performance evaluation could have assigned a different rating to VSI's proposal.

[ ]. If the Agency intends to solicit reviews of past performance, full and open competition requires a delivery system that is less capricious and prone to unreported problems. The [ ] PPQ appears to have been timely sent and received.[20] AR at 1475. The Agency failed to consider a PPQ that was arguably in its possession.

The court finds that these were *de minimis* errors in BayFirst's past performance evaluation, which, if there had been no other errors in the TEP's past performance evaluation of proposals, could have been overlooked by this court.

### 3. The Agency's Negative PPQ Regarding HSA's Performance as the Incumbent Contractor

The TEP relied heavily on a PPQ that described HSA's incumbent contract performance as marginal in many respects, and good in others. Several significant measures of performance were rated as marginal: business integrity and business conduct, overall quality of services provided, corrective actions/quality control, quality checks/inspections, personnel vacancy responses, and project manager. AR at 566–67, 569. Other measures were rated good: cooperation, compliance with contract terms, lack of proposed change orders, timely project completion, emergency response, delegation of authority to managers, and technical staff. *Id.* at 566–69. The Agency's representative stated that the Agency would not award another contract to HSA. *Id.* at 569. The TEP reasonably considered this highly relevant past performance of BayFirst's subcontractor to have been rated marginal by the Agency's representative. *Id.* at 561.

The court includes here two quotes from this PPQ, to further explain the overall Marginal past performance rating assigned to BayFirst's proposal:

Question 3. Business integrity and business conduct. [rating: marginal].

The company [HSA] was purchased by a large company (non 8a) that forced our office into re-soliciting this effort early. [The Office] was in the midst of transitioning the largest worldwide security services contract, with office resources already tapped, at the exact same time. Therefore, the unilateral actions of H[SA], which could not have come at a worse time, resulted in our office accelerating this procurement, caused disruption among the current HSA employees (regarding their employment future) and did not bode well with our office management.

Question 4. Given the opportunity, would your organization enter into another contractual relationship with this contractor in the future? [answer: no].

While [HSA] did not excel or exceed contract requirements, they generally met the requirements. However, while [the Office] cannot prevent the situation described in the answer to number 3 above, this change caused heavy office disruption that impacted our mission. This situation caused many of our highly technical professional labor category personnel to resign and seek employment elsewhere. Additionally, many HSA employees were not satisfied with the level of support provided to them via HSA and either requested that [the Office] convert their positions to [personal services contract or federal employee] positions in our office. To date, 30 employees have converted. Therefore, since this is a best value contract, the future preference would be to have a more motivated contractor who desired to meet the professional needs of their employees and attempted to exceed customer expectations.

AR at 569 [formatting altered]. Intervenor-defendant asserts that "the government was unhappy with" HSA's past performance as the incumbent contractor. VSI Mot. at 24. Plaintiff states that this PPQ shows animus toward BayFirst's subcontractor. Pl.'s Mot. at 29.

The court notes that an Agency may hold a critical opinion of an incumbent contractor and still conduct a rational and fair source selection process. *See, e.g., Four Points by Sheraton v. United States,* 63 Fed.Cl. 341, 344 (2005) ("Criticism of Plaintiff's performance on the incumbent contract in areas required to be evaluated or erroneous evalua-

**20.** Plaintiff suggests that [ ].

tions or inconsistent scoring do not rise to the level of motivation for bias."). Here there has been no allegation of bad faith or bias and the court does not fault the Agency on such a basis. The record does support a finding that the flaws in the past performance evaluation of BayFirst's and VSI's proposals, flaws which include disparate treatment, factual errors, and the failure to consider a PPQ delivered to the Agency, were the result of the Agency's failure to carefully review and properly evaluate the proposals and PPQs before it.

## C. Faulty Tradeoff Analysis

 There are two principal errors in the Agency's tradeoff analysis, which was offered in support of the Agency's decision that VSI's proposal provided the best value of all of the proposals submitted in response to the solicitation.[21] First, the tradeoff analysis employed a weighting scheme for evaluation factors that is different than the scheme set forth in the solicitation. Second, many, if not most, of the evaluation ratings assigned to BayFirst's and VSI's proposals were irrational. A tradeoff analysis based on significantly flawed evaluation ratings is itself irrational. *See, e.g., Femme Comp Inc. v. United States,* 83 Fed.Cl. 704, 767 (2008) (noting that significantly flawed evaluation ratings may invalidate a tradeoff analysis and best value award decision). The court addresses each of these significant errors in turn.[22]

### 1. Weighting Scheme in Tradeoff Analysis Different from Scheme in Solicitation

The evaluation factor weighting scheme set forth in the solicitation was discussed earlier in this opinion, and was found to be confusing and incomplete. *See supra* Background Section I(C). Nonetheless, three evaluation fac-

tors were identified, and are listed here in order of importance: technical, past performance and price. AR at 264–65. Together, the technical and past performance factors were significantly more important than price. *Id.* at 264. The technical factor had two subfactors, Management Plan and Transition Plan, whose relative importance was not clearly identified in the solicitation. *See supra.*

The SSD, however, conflated evaluation factors and sub-factors in the single paragraph explaining the Agency's tradeoff analysis. Thus, the tradeoff analysis assumed, contrary to the solicitation, that the three evaluation "sub factors" were Management Plan (deemed the "highest and most important technical sub factor"), Transition Plan (deemed "the second highest important sub factor"), and past performance (deemed "the third highest important sub factor"). AR at 1200. Although the evaluation criteria weighting scheme in the tradeoff analysis paragraph is not easily deciphered, the Agency appears to have conducted its tradeoff analysis using three non-price evaluation criteria, whether these are termed factors or sub-factors, listed here in descending order of importance: Management Plan, Transition Plan, and Past Performance. This is not the weighting scheme set forth in the solicitation, and therefore constitutes an arbitrary and improper evaluation scheme. Because the Agency's best value decision is based on an evaluation scheme that differs from that disclosed to offerors, the best value award is invalid.[23]

### 2. Tradeoff Analysis Based on Flawed Past Performance Ratings and Other Errors

As previously discussed, the TEP's Management Plan ratings for the proposals of BayFirst and VSI were irrational, because

---

21. The court has previously noted that the Agency's Source Selection Decision gives no indication of the independent judgment of the Source Selection Authority other than his signature. *See supra* note 4.

22. The tradeoff analysis contains a curious factual error as well. The analysis states that the four proposals rated Unacceptable had lower evaluated prices than VSI. AR at 1200. In fact, the

opposite is true. *See id.* at 1199. This is yet another example of a source selection decision riddled with mistakes.

23. Although this error, standing alone, might not have prejudiced BayFirst, in the context of this procurement the multitude of errors committed by the TEP and the SSA constitute prejudicial error, as discussed *infra.*

the TEP awarded a strength to VSI for inadequate resumes and *no* strength to BayFirst for resumes that were deemed adequate. Additionally, the Marginal rating assigned to BayFirst's Transition Plan was irrational, arbitrary and capricious, because the weaknesses assigned BayFirst's Transition Plan were irrational or not warranted under the evaluation criteria set forth in the solicitation. Finally, as to past performance, the ratings applied to BayFirst's and VSI's proposals were arbitrary and capricious, because they were the product of disparate treatment and reasoning replete with factual errors. Because the ratings that provided the basis for the Agency's tradeoff analysis and best value award were fundamentally flawed and arbitrary, the best value award itself was arbitrary and capricious. *See, e.g., Huntsville Times Co. v. United States*, 98 Fed.Cl. 100, 119 (2011) (holding that when a Source Selection Authority (SSA) has relied on the errors committed by the technical evaluation team, "these significant errors are enough to significantly compromise the award decision produced by the SSA").

### D. Prejudice

The parties dispute whether BayFirst was prejudiced by the procurement errors committed by the Agency. The question is not whether BayFirst has proved that it would have received the award but for these procurement errors. *See, e.g., Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996) ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.") (citations omitted). Rather, the question here is whether BayFirst has shown that it had a substantial chance of being awarded the contract if the demonstrated procurement errors in this case had not occurred. *Linc Gov't Servs., LLC v. United States*, 96 Fed.Cl. 672, 696 (2010) ("[T]he plaintiff must show that it would have had a substantial chance of being awarded

the contract but for the combined impact of any agency decisions *adjudged* to be unlawful.") (citations omitted).

■ As discussed above, this was a fundamentally flawed source selection process. BayFirst was the lowest-priced offeror, with greater access to incumbent HSA employees than any other offeror. If a proper evaluation of proposals had occurred, and the errors pointed out in this opinion had been avoided, the technical factor ratings could easily have been much closer than those erroneously produced by the TEP and endorsed by the SSA. There is a substantial chance that the SSA's tradeoff analysis would then have indicated that BayFirst's proposal, not VSI's higher-priced proposal, provided the best value to the government.[24] The court is satisfied that BayFirst had a substantial chance of award, and was prejudiced by the procurement errors discussed in this opinion. Because BayFirst has prevailed on the merits, the court turns to the factors governing the award of injunctive relief.

## VII. Injunctive Relief

As the Federal Circuit has held:

In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed.Cir.2004) (citation omitted). Here, plaintiff has succeeded on the merits. Thus, the first injunctive relief factor favors enjoining the Agency's contract award to VSI.

■ This court, in many cases, has found that the loss of the opportunity to fairly

---

24. The court disagrees with intervenor-defendant's assertion that BayFirst cannot show prejudice because it teamed with HSA []. Tr. at 79. The marginal PPQ received for HSA's incumbent contract should be weighed pursuant to the evaluation scheme set forth in the solicitation. HSA's performance on the incumbent contract is not the sole, or even the most important, aspect of BayFirst's proposal to be evaluated.

compete for a contract constitutes irreparable harm. *See, e.g., Hosp. Klean of Tex., Inc. v. United States,* 65 Fed.Cl. 618, 624 (2005) ("Here, absent injunctive relief, [the protestor] will lose the opportunity to earn the profit it would have made under this contract. Such loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm.") (citations omitted); *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 744 (2000) (holding that the "potential loss of valuable business" may constitute irreparable harm). The court considers the loss of potential profits from a large government contract award, in this instance, to constitute irreparable harm.[25] *See ViroMed Labs., Inc. v. United States,* 87 Fed.Cl. 493, 503 (2009) (noting that bid preparation and proposal costs are not equivalent to potential profits from a government contract). Thus, plaintiff has satisfied the second criterion for receiving a permanent injunction.

■■■ As to the balance of hardships, the parties have barely discussed this issue. The government has not made a showing that an additional delay in awarding this contract will constitute a hardship for the Agency. Intervenor-defendant has not offered a persuasive argument that VSI will suffer undue hardship if its award is enjoined. This court tends to weigh the balance of hardships factor in favor of the protestor who has succeeded on the merits, unless specific facts counsel otherwise. *See, e.g., Cardinal Maint. Serv., Inc. v. United States,* 63 Fed.Cl. 98, 110–11 (2004) (discussing the government's potential cost savings from a properly competed contract and "discounting" the harm to an awardee whose award was not proper). Therefore, this factor, too, is in favor of BayFirst's request for injunctive relief.

■■■ Finally, the court finds that the public interest is best served by enjoining the award to VSI. The Agency's award decision did not have a rational basis. Such award decisions destroy the public trust in govern-

ment contracting and deprive the government of the benefits of full and open competition. *See, e.g., Metcalf Constr. Co. v. United States,* 53 Fed.Cl. 617, 645 (2002) (noting the twin goals of preserving "public confidence and competition in the federal procurement process") (citation omitted). Because all four factors favor injunctive relief in this protest, the award to VSI must be overturned.

## VIII. Nature of the Permanent Injunction

The award of Contract No. SAQMMA–11–D–0077 must be set aside.[26] The court notes that the Agency, may, at its option, choose not to procure this requirement through Solicitation No. SAQMMA10–R–0331, and may issue a new solicitation. The Agency also has the discretion to not re-procure these services. If, however, the Agency wishes to conduct a proper evaluation of the proposals received in response to the solicitation, the court provides the following directives. The court relies upon its "sound judgment" to fashion injunctive relief suitable to the circumstances of this procurement. *PGBA,* 389 F.3d at 1232; *see, e.g., Magnum Opus Techs., Inc. v. United States,* 94 Fed.Cl. 512, 551 (2010) (discussing this court's "authority to tailor injunctive relief").

Plaintiff asks that the Agency be directed to "reevaluate the technical proposals of VSI and BayFirst." Pl.'s Reply at 41. Defendant suggests that it is inappropriate to exclude [ ]'s proposal from any re-evaluation ordered by this court. Def.'s Reply at 32 n. 8. The court agrees that [ ]'s proposal appears viable and should not be excluded from any re-evaluation of proposals. Defendant goes further and states that "it should be left to the [A]gency to decide which offerors to include in any reevaluation." *Id.* The court does not believe that such unlimited discretion is warranted in these circumstances.

Only three of the seven proposals received by the Agency, those submitted by BayFirst, [ ] and VSI, were rated higher than "Unacceptable." AR at 1176. If the Agency

---

25. [ ].

26. The contract number is sometimes cited in the record as SAQMMA–11–C–0077. *Compare* AR at 1217 *with id.* at 1218.

wishes to proceed with this solicitation, at least these three acceptable proposals must be re-evaluated by the Agency. *See id.* at 1200 (stating that the other four proposals "received unacceptable technical ratings which makes them ineligible for award"). The Agency focused its tradeoff analysis on VSI's, BayFirst's and [ ]'s proposals, having found the other four proposals ineligible, which supports the court's view that any re-evaluation of proposals must include, at the very least, a re-evaluation of VSI's, Bay-First's and [ ]'s proposals. *See id.* ("In considering award of [a contract] to VSI who offers higher pricing than that of BayFirst and [ ]'s proposed lower prices, VSI's technical proposal appears to offer exceptional benefits over BayFirst and [ ], as documented by its excellent technical and past performance ratings."); *see also id.* at 12–13 (Contracting Officer's Statement) (discussing only the proposals submitted by VSI, BayFirst and [ ] in her explanation of the award decision).

The court notes, however, that the Agency made significant errors in applying the evaluation criteria set forth in the solicitation, and produced documents supporting its award decision that were teeming with factual errors. In these circumstances, the Agency could, within its discretion, choose to re-evaluate all seven proposals, rather than limit its re-evaluation to those currently rated higher than Unacceptable. In the court's view, the only justifiable approaches under the current solicitation are to re-evaluate VSI's, BayFirst's and [ ]'s proposals, or all proposals. Should the Agency wish to proceed under this solicitation, those are the only corrective actions this court will condone.

Any technical re-evaluation of proposals must correct the errors noted in this opinion.[27] Upon re-evaluation, the Agency is permitted, but not required, by the solicitation to enter discussions with offerors. AR at 265. Finally, the agency must conduct a proper tradeoff analysis based on the re-evaluation of proposals, which must represent the independent judgment of the source selection authority.

## CONCLUSION

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion for Judgment Pursuant to Rule 52.1, filed September 19, 2011, is **GRANTED**;

(2) Defendant's and Intervenor–Defendant's Cross–Motions for Judgment on the Administrative Record, filed October 17, 2011, are **DENIED**;

(3) Plaintiff's Motion for Permanent Injunction, filed August 15, 2011, is **GRANTED** as follows:

The United States, by and through the Department of State, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from obtaining performance from Veteran Solutions, Inc. on **Contract No. SAQMMA–11–D–0077** awarded on April 25, 2011; further, any re-evaluation of proposals received under **Solicitation No. SAQMMA10–R–0331** shall be performed pursuant to the instructions given in Discussion Section VIII of this opinion;

(4) The Clerk's Office is directed to **ENTER** final judgment in favor of plaintiff;

(5) On or before **January 6, 2012,** counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(6) Each party shall bear its own costs.

---

27. The court will not repeat here the many errors identified in this opinion but notes, for the sake of clarity, that if the Agency determines that the PPQ [ ] was timely received, that PPQ should be considered by the Agency as part of its re-evaluation of BayFirst's past performance. *See* AR at 1477–83.